COMMONWEALTH vs. LUIS GERMAN ALICEA.

Middlesex. April 3, 1978. — October 3, 1978.

Present: HENNESSEY, C.J., BRAUCHER, KAPLAN, WILKINS, & LIACOS, JJ.

*Arrest. Evidence*, Admissions and confessions. *Probable Cause. Identification. Waiver. Practice, Criminal*, Directed verdict, Assistance of counsel. *Constitutional Law*, Admissions and confessions, Probable cause, Waiver of constitutional rights.

Evidence at a hearing on a motion to suppress that the defendant in a murder case had been taken to a police station shortly after the shooting as a possible witness, given Miranda warnings, and questioned, and that the defendant was arrested only when a witness identified him as the one who had shot the victim, supported the judge's findings that the defendant had not been under illegal arrest when he first appeared at the police station, that the identification at the police station did not violate the defendant's right to due process of law and that the defendant had knowingly and voluntarily waived his rights in making statements to the police. [508–515]

Evidence at a murder trial was sufficient to warrant the denial of the defendant's motion for a directed verdict. [515–519]

Evidence introduced by the defendant at a murder trial did not provide any basis for affirmative action on the defendant's motion under G. L. c. 278, § 11, for entry of a verdict of not guilty or for a new trial, nor for any extraordinary relief under § 33E. [519–521]

There was no merit to contentions of a defendant in a murder case that the prosecutor appealed in his questioning of witnesses and in the closing arguments to any latent bias the jurors may have had against Puerto Ricans and that the prosecutor expressed his personal opinion of the defendant's guilt. [521–522]

The judge at a murder trial did not abuse his discretion in admitting testimony about certain events preceding the homicide which was relevant to motive and credibility of witnesses. [522]

At a murder trial there was no error in permitting a defense witness to claim his privilege against self-incrimination. [522]

The judge at a murder trial did not err in failing to put the question of the voluntariness of the defendant's confession to the jury where the issue was not sufficiently raised at trial. [522–523]

There was no merit to a defendant's contention that his representation by appointed counsel at a murder trial was constitutionally inadequate. [523–524]

INDICTMENTS found and returned in the Superior Court on July 15, 1975.

The cases were tried before *Mazzone, J.*

After review was sought in the Appeals Court, the Supreme Judicial Court, on its own initiative, ordered direct appellate review.

*Lazar Lowinger & Manuel Nelson Zapata* for the defendant.

*Susan C. Mormino,* Assistant District Attorney (*Michael J. McHugh,* Legal Assistant to the District Attorney, with her) for the Commonwealth.

KAPLAN, J. Between late afternoon of May 10, 1975, and sometime after midnight of May 11, a number of incidents, with some attendant violence, occurred at the Julian Steele Housing Project in Lowell pitting "Puerto Rican" against "American" residents or adherents.[1] About 12:30 A.M., or later, a young woman, seventeen-year old Sylvia Cormier, standing outside 92-94 Shaughnessy Terrace, part of building 3 of the project, was killed by a bullet to the head fired from a .22 caliber gun. The defendant Alicea was indicted for the murder of Cormier and also for possession of a firearm without license and for unlawfully discharging a firearm within the city limits of Lowell. He was found guilty by a Middlesex jury of murder in the second degree and of the other two offenses.[2] Appealing from the judgments of conviction to this court pursuant to G. L. c. 278, §§ 33A-33G, the defendant contends that the trial judge committed errors in

[1] From the record we can identify particular incidents about 6:30 P.M. and 10 P.M. preceding the fatal encounter.

[2] The defendant was sentenced to life imprisonment at the Massachusetts Correctional Institution at Walpole for the murder and to imprisonment for one year in a house of correction for the unlawful possession; the indictment for discharge of the weapon was (without objection) placed on file.

refusing to suppress his statements to the police and an identification and other evidence, and in denying his motions for directed verdicts of acquittal for failure of proof. Miscellaneous other errors are also claimed and will be considered.

1. *Motion to suppress.* We accept (and here restate and elaborate somewhat upon) the facts as found by the judge on the defendant's motion to suppress, heard at voir dire before trial. The defendant with two other men was brought to the main room of the criminal bureau at the Lowell police station about 1:25 A.M., May 11. A radio transmission had informed Inspectors Peter Gickas and John Sullivan, on duty in the station at that time, that a shooting had taken place at the project and that three possible witnesses would be arriving. Gickas approached the defendant[3] and, before any material exchange, read him the usual Miranda warnings, but as the defendant responded with an equivocal gesture to the question whether he understood English, Gickas attempted to sound the words from a card in Spanish. Shortly he abandoned the effort and telephoned an interpreter, Efrain Rivera. Seeing the interpreter enter the place some minutes later, the defendant said in Spanish, "I'm in a lot of trouble," but further conversation was stopped when Gickas directed the interpreter to get on with the Miranda warnings. The interpreter read the Spanish card and emphasized the importance of the choice involved; the defendant said he understood. The interpreter apprehended that the defendant had been drinking, and the defendant later told him he had been drinking heavily; but the defendant was not disabled through intoxication and was carrying on rational discourse.[4]

---

[3] Inspector Gickas explained that by appearances the defendant was the most amenable of the three to conversation or inquiry.

[4] Gickas testified that he did not perceive the defendant had been drinking.

To avoid interruption, the defendant, Gickas, and the interpreter moved to the smaller sergeant's room. As the defendant was speaking conversationally of the troubles at the project,[5] Inspector Sullivan entered and said, in effect, that there were some people on hand who could identify the man who shot Sylvia Cormier;[6] did the defendant want to meet them? The defendant said, "Let's go," or the equivalent, and the group walked to the guard room. As they entered, with the defendant somewhat in the lead, one of those present in the room, Raymond Saab, spoke up and identified the defendant as the one who shot the victim.[7] It was about 2 A.M.

The group retreated to the hallway outside the guard room. Now, said Sullivan, the matter was serious and the defendant could and would be charged with assault with a dangerous weapon and firearm violations;[8] he could help the police and himself by producing the weapon and telling his story. The defendant said he had fired a gun into the air. Sullivan said there was a test by which it could be determined whether an individual had fired a weapon recently.[9] The defendant then said he had fired into a crowd two or three times and seen someone go down. Would he be willing to take the police to the gun? The defendant agreed.

---

[5] It will be ·understood that speech by the defendant or the police passed through the interpreter.

[6] That the victim was dead was not communicated to Gickas until he and the defendant and others had left the station and were engaged in the search for the defendant's gun as later described.

[7] According to the testimony at voir dire, it was Saab who spoke as the defendant entered. At trial, Saab said he was not the one who spoke, but it is clear in any event that the defendant was recognized by Saab, Batstone, and Stephan Murphy present in the guard room and that the fact was communicated. (As to how each had observed the person they identified as the defendant, see below.)

[8] The interpreter however did not recall that an assault charge was mentioned.

[9] There was a mixup of interpretation here, with the interpreter saying that such a test already had been made, but the interpreter apparently was instructed to correct the statement.

A party including the defendant, Gickas, and the interpreter proceeded by car to the area, roughly where Murray Terrace and Chippewa Street meet Shaughnessy Terrace, and a search began in an open field opposite, into which the defendant, so he indicated, had thrown his gun. A fruitless scramble followed for some forty-five minutes through the field under flashlights and other illumination. Gickas accused the defendant of lying, and the defendant avowed that after firing the gun he had driven with another man to a place by railroad tracks and the gun had been buried there.[10]

The party then moved out to find the location, but stopped first at 81 Chippewa Street. Word had been communicated to Gickas by other police investigating the crime that the defendant had worn earlier that night a white turtleneck sweater or shirt—when he appeared at the police station he was wearing a three-quarter length brown leather coat or jacket and yellow, bell-bottomed, cuffed trousers, but was shirtless. The defendant said the shirt could be found at the house of one of the Curet family nearby at the address mentioned. Gickas entered the house through a rear window—the place was locked, no one within—and in a bathroom he discovered a white turtleneck which the defendant acknowledged. With guidance from the defendant, the party went on for about two miles and finally stopped at railroad tracks near the loading platform of the Prince macaroni company. With the use of a metal detector, the defendant's .22 caliber revolver (empty of cartridges) was found covered over lightly by stones between railroad ties.

Returned to the sergeant's room at the police station about 6 A.M., the defendant was given his Miranda warnings in Spanish and signed a waiver of rights form in

---

[10] About this time the defendant commenced saying that he wanted to go home. The judge remarked that this "was expressed in a manner that indicated that he wanted to get it over with quickly and not that he wished to avoid any further interrogation."

English translated for him orally.[11] He gave a statement
rendered by Gickas on a typewriter in English but veri-
fied by him after oral translation. The statement started
with his friends Roberto and Delores Curet appearing at
the defendant's home in Roxbury at 6:30 P.M., May 10.
The defendant, taking with him his revolver, went with
these two to Roberto's apartment at the project, arriving
about 7 P.M. "About 10 or 11 P.M.," the defendant went to
the house of Orlando Curet, a block away at the project.
He stayed there ten minutes and returned to Roberto's.
Going and coming he was taunted by a group of "white"
men with clubs and knives in their hands. A white man
fired a rifle twice in the air, whereupon the defendant
drew his revolver from his waistband and fired twice in
the air. When the defendant told Roberto what had hap-
pened, Roberto said the best thing to do was to hide the
gun, and he and Roberto drove in Roberto's car to a place
near railroad tracks. Roberto buried the gun near the

---

[11] On the return to the guard room, the defendant was told that he
was entitled to use the telephone. He did not then attempt a call as
he thought the number he had in mind would not answer. He signed
a telephone rights form. Later that morning, after making and signing
his statement, the defendant said he wanted to call a person named
Curet in Roxbury. The number being unlisted, Gickas spoke with a
telephone supervisor who called the number (which she did not dis-
close) and left a message to phone the police station. But no call was
received there. In this court—although not below—the defendant ob-
jects to the failure to provide earlier access to the telephone, evidently
referring to G. L. c. 276, § 33A. The statutory duty, however, arises
only from the time of "custody" or "arrest," and here this coincided
approximately with the defendant's incriminating statements. It
would be hard to say in the present case that "unfavorable evidence
[was] gained as a result of denying a defendant the right to use a
telephone," and that the evidence ought, accordingly, to be suppressed
(see Commonwealth v. Jones, 362 Mass. 497, 502 [1972]); and we note
also as a makeweight that it is not indicated that the statutory viola-
tion was intentional or wilful (id. at 503). See also Commonwealth v.
Zukoski, 370 Mass. 28, 29-30 (1976); Commonwealth v. Daniels, 366
Mass. 601, 610 (1975); Commonwealth v. McGaffigan, 352 Mass. 332,
335-336 (1967). All this is not to condone delay in advising suspects of
their right to use a telephone which in other circumstances could be
fatal to a prosecution.

tracks in a pile of stones. They returned to Roberto's house.[12] Fifteen minutes later, while washing his face after removing his white turtleneck shirt, the defendant heard gunfire. He ran out to the next corner where he saw a girl lying on the sidewalk. He was grabbed at by a white man and a woman, but got away from them and ran back to Roberto's. Roberto said the white people thought the defendant had shot the girl; they had better leave. They got into Roberto's car and drove around for five minutes and returned to the house. The police were there and asked the defendant's name and he was brought to the police station.

On the foregoing evidence brought out in testimony at voir dire by Gickas and Rivera, the sole witnesses, the judge denied the motion to suppress, overruling claims of irregularity in the Miranda warnings, or impropriety in the conditions of the identification, and of unjust coercion of the defendant resulting in an unintelligent waiver of rights on his part (a claim addressed particularly or especially to the admission of the written statement).

In this court the defendant makes the fresh contention[13] that he was under illegal arrest, i.e., arrest without probable cause, when he appeared at the police station, and because of this violation the Commonwealth should be barred the use of the evidence subsequently obtained. The case is sought to be analogized to *Brown* v. *Illinois*, 422 U.S. 590 (1975), where the mere giving of Miranda warnings was held not to seal off an antecedent illegal arrest. See *Commonwealth* v. *Haas*, 373 Mass. 545, 555-556 (1977). Had the defendant been arrested when he entered the police cruiser or the police station, it would indeed have been an arrest on bare suspicion or less, and

---

[12] It is fairly clear that the defendant meant 81 Chippewa Street which was actually the home of Juana Curet, Roberto's mother.

[13] We are content to address ourselves to this belated argument which in all events would call for attention in our general review of the case pursuant to G. L. c. 278, § 33E (see below).

not on probable cause. What the consequences of such a violation would be, we need not to attempt to say, because we think there was no arrest at that stage. The judge ruled for Miranda—Fifth Amendment—purposes that the defendant was not in custody until after the identification, and the facts he relied on would support equally well a ruling that arrest—a Fourth Amendment question —occurred at that point and not before. When Inspector Gickas encountered the defendant he had in mind the content of the radio transmission and regarded him only as a possible witness or as having at most some inchoate connection with the criminal event, and he so treated him. The imparting of Miranda warnings was not tantamount to or suggestive of an arrest (see below).[14] Probable cause for arrest was supplied by the episode in the guard room followed swiftly by the defendant's statements in the hallway and it was symbolic of the change in the defendant's status that (as testified to at trial) he was placed in handcuffs as the party went forth to search for the weapon. The present case resembles *Commonwealth* v. *Cruz*, 373 Mass. 676, 682-685 (1977), so far as that went on a construction of its facts as involving a noncustodial colloquy or interrogation during the defendant's first hour at the police station, which then, by reason of his increasingly self-inculpatory statements, passed into a custodial phase.

As to the Miranda warnings proper, they were first given before the situation became custodial, and may be understood as a step out of abundant caution to counteract any coercive element inhering in an interview at a police station. Cf. *Oregon* v. *Mathiason*, 429 U.S. 492 (1977).[15] The warnings carried through and were effective

---

[14] The interpreter in fact stated at voir dire that he informed the defendant he was at the station only as a witness and that the defendant understood this.

[15] Gickas testified at voir dire that he usually gave Miranda warnings to witnesses who had difficulty with the English language (and

when suspicion, after a short interval of time, became centered on the defendant. See *Commonwealth* v. *Cruz, supra* at 685-688; *Commonwealth* v. *Valliere,* 366 Mass. 479, 487 (1974); *United States* v. *Standing Soldier,* 538 F.2d 196, 201 n.5 (8th Cir.), cert. denied, 429 U.S. 1025 (1976); *Roy* v. *Hall,* 521 F.2d 120, 123-124 (1st Cir. 1975). Cf. *Commonwealth* v. *Murray,* 359 Mass. 541, 546 (1971). It would have been cleaner practice to inform the defendant explicitly of the change of his condition and to give him his Miranda rights again then and there, but we agree with the judge's conclusion that the omission was not a failure in a constitutional duty. There was a repetition of the Miranda warnings and an express waiver by the defendant on the return to the station in the early morning before Gickas took his narrative statement.

We also agree with the judge that there was nothing contrary to due process about the scene in the guard room. We have dealt on other occasions with the question of bringing a suspect before the victim or witnesses of a very recent crime for "one on one" identification—or exoneration. Of these tests we said in *Commonwealth* v. *Barnett,* 371 Mass. 87, 92 (1976), cert. denied, 429 U.S. 1049 (1977): "[T]he police procedure of arranging these showups is recognized as usual and natural and justified by the need for efficient investigation in the immediate aftermath of crime. . . . To have the witness view the suspect while his recollection or mental image of the offender is still fresh, before other images crowd in or his attempts to verbalize his impressions can themselves distort the original picture, provides the witness with good opportunity for an accurate identification. . . . A further consideration is that prompt confrontation yielding a negative result, besides freeing the innocent, informs the police that a possible predisposition on their part is or may be in error and releases them quickly to follow another track. . . . The general view that such speedy con-

to whom, we may assume, police interrogation might appear more threatening than to persons free of that handicap).

frontations are permissible is accepted in this jurisdiction and elsewhere. [Citations omitted.]" The line of authority supports a fortiori the lawfulness and fairness of the procedure of confrontation in the present case which was actively assented to or even invited by the defendant who at the moment had not been implicated in the crime.

Finally, responding to any claim that the defendant's statements or demonstrative acts were in some sense "involuntary," we find no reason to cavil with the judge's opinion that the defendant understood his predicament and was not overborne by drink, fatigue, or pressure from the police. Compare *Commonwealth* v. *Sires*, 370 Mass. 541, 543-545 (1976), with *Commonwealth* v. *Hosey*, 368 Mass. 571 (1975). Nor do we approach here a case where official pressure on a defendant was so unseemly or uncivilized that we might refuse to receive his statements in evidence regardless of whether he was in fact overborne. Cf. *Jackson* v. *Denno*, 378 U.S. 368, 376-377 (1964).

2. *Motion for directed verdict at close of Commonwealth's case.* We pass to the trial. The question under the present heading reduces to whether the jury could find beyond a reasonable doubt that it was the defendant—not some other person engaged in violence that night—who was responsible for the death. We conclude that the jury could so find, and we need only mention the main elements of the proof which, if believed, as they well could be, established that the defendant was the culpable actor.

The witnesses Gickas and Rivera, testifying for the Commonwealth at trial, gave in substance the evidence, bearing against the defendant, which they had given at voir dire.[16] In addition, we point to the direct observations testified to by the Commonwealth witnesses Barbara Lowe, Raymond Saab, Neil Batstone, Stephan Murphy,

---

[16] At trial the interpreter was not clear whether the defendant's story of shooting in the air on his walk back from Orlando Curet's house was recounted in the hallway conversation after the identification, as well as in the defendant's written statement.

Officer Dennis Sargentelli, and Trooper William E. Duke.

Lowe, from the second floor of 8 Murray Terrace (at building 4 of the project), looking across that street to building 10 fronting on Shaughnessy Terrace, saw two men near that building during the moments which can be taken to be those when shots, including the fatal shot, were fired. One of the men, seen under adequate lighting, conformed in dress to the clothing the defendant is proved to have worn. Standing at a tree outside number 10, he was yelling "Come on, you Yankees. You want more—I'll give you more." He was facing up Shaughnessy in the direction of building 3 (with address numbers 84-94 Shaughnessy) and in his outstretched hand he held a small object which was firing and sparking. There was no fire from the other man.[17]

Saab was standing with a number of acquaintances, including Sylvia Cormier, outside building 3. (Sylvia had appeared there about 11:30 P.M.) About 12:30 A.M. someone was heard yelling from Murray Terrace, below, "There they are." Looking down Shaughnessy Terrace, Saab saw two men in the vicinity of building 10 perhaps 100 feet away. One near the sidewalk was a Puerto Rican with moustache and goatee and clothing all descriptive of the defendant that night. He was holding a gun in his outstretched hand. One Brian Murphy on the other side of Shaughnessy from Saab exclaimed, "I'm hit." Immediately thereafter Saab saw a spark at the hand of the gunman below and heard a second shot and felt Sylvia fall across him. Within moments two men came up Shaughnessy from Murray Terrace and approached Saab and the fallen victim; one was the man previously described whom Saab identified as the defendant. This man said in English with Spanish accent, "We're sorry. We shot the wrong one." The two turned and walked rapidly down Shaughnessy.[18]

---

[17] A few minutes later Lowe went to the locus on Shaughnessy where she saw the victim prostrate and also saw Saab.

[18] Saab, who had a criminal record, was incarcerated at the Billerica house of correction for an independent offense while the defendant

Batstone was at a second story window of 92 Shaughnessy when he heard several gunshots from the direction of building 10 and saw Brian Murphy wounded and Sylvia felled. Sylvia's sister, who was in the immediate group, got over her protectively. Batstone did not observe Saab. Moments later Batstone saw three men standing over Sylvia; they had come up Shaughnessy from Murray Terrace. The sister, looking at the men, said, "You shot her." Batstone identified one of the men by appearance and dress as the defendant. As the three started to run back toward Murray Terrace, the defendant, seemingly addressing some of the group now fleeing in fear, cried, "I'll kill you."

Stephan Murphy (brother of Brian) heard gunshots around 12:30 A.M. He ran out of 204 Shaughnessy toward these sounds and saw three Puerto Rican men in the vicinity of building 10. One, whom he identified by appearance and garb as the defendant, was running "up" Chippewa Street, which we take to mean in a northerly direction that would take him to or past 81 Chippewa. Murphy continued on Shaughnessy and saw Sylvia lying on the ground. Saab was there.

Officer Sargentelli, on single patrol, answering a call at 12:58 A.M., went to 92 Shaughnessy and found Sylvia on the sidewalk; a sizeable crowd was now gathered. He was told the culprit had run to Chippewa Street. Going on foot to the junction of Shaughnessy and Chippewa, he saw a

---

was held there awaiting trial. Saab testified that the defendant assaulted him without immediate cause; apparently this occurred after Saab had testified at the defendant's probable cause hearing. The defense called Juan Pedrosa, a correctional officer at Billerica, who testified that Saab told him after the assault that he understood the defendant's feelings: the defendant was not guilty of the murder of Sylvia Cormier; he, Saab, had been pressured into speaking against the defendant, and intended thenceforth to help the defendant. Pedrosa did not report Saab's alleged remarks at the time. See note 25 *infra*.

purple Thunderbird automobile taking off at high speed from the vicinity of 81 Chippewa. He observed three Puerto Rican men in the car. Officer Santos approached Sargentelli and told him to look out for one "Luis" (with a description of his clothing matching the defendant's). About fifteen minutes after its departure, the purple car returned and parked at 77 Chippewa. Three men stepped out; one (not the driver) was the defendant. Sargentelli, although referring to the defendant on cross-examination as a "possible suspect," did not know at the time in what category the defendant belonged, and did not arrest him. Sargentelli was present when the defendant's revolver was recovered.

State Trooper Duke, assigned to firearms identification, received for analysis the gun (a .22 caliber revolver, of Rohm manufacture, holding seven cartridges) and a small lead fragment and part of a .22 caliber projectile removed from the victim's head at the autopsy on May 11. Test fired projectiles from the revolver showed eight lands and grooves with a directional right twist. As the spent projectile had been damaged through impact, it showed only four lands and grooves but these had the same spacing and directional twist as the test firings. Trooper Duke gave it as his opinion that the spent projectile was consistent with having been fired from that revolver, but he could not say positively that it had been so fired.

We are in agreement with the trial judge that it would have been an illegal invasion of the jury's province to direct a verdict on any of the indictments at the close of the Commonwealth's case. See *Commonwealth* v. *Clifford*, 374 Mass. 293, 296 (1978), and cases cited, as to the standard for direction. Adding the witnesses' observations, just summarized, of the defendant's movements and actions, to the testimony of Inspector Gickas and the interpreter, the jury could have been firmly convinced that the defendant came to Lowell, as an outsider, illegally possessed of a revolver; that by its discharge there,

without particular provocation, he took the life of Sylvia Cormier; that he then attempted to conceal the weapon; that his "Let's go" was a gamble to secure a quick exoneration to mislead the police; the gamble failing, that he offered cooperation as a means of insinuating his innocence, and in his several statements mixed falsehood with truth in an effort to evade responsibility for the homicide. On varying views the proof on the principal accusation could point to murder in either degree or, conceivably, to manslaughter of either class, as the judge charged.[19]

3. *Remarks on defendant's case.* The defense offered proof. There was no motion for a directed verdict at the close of all the evidence, and thus a motion noted on the docket as made five days after verdict under G. L. c. 278, § 11, for entry of a verdict of not guilty or for a new trial, did not have its required predicate and was irregular; in all events it was not pressed or ruled on. However, we may say that the defendant's case did not so shake or confound the Commonwealth's case as to provide any plausible basis for affirmative action on a § 11 motion, or, it may be added, for any extraordinary relief under G. L. c. 278, § 33E.

Roberto Curet testified that he had not accompanied the defendant from Boston on May 10, but that the defendant arrived at 81 Chippewa with Delores Curet around 8 P.M. (Delores was not offered as a witness.) After 10 P.M., perhaps between 10:30 and 11 P.M., a group including Roberto and the defendant left to "fight," as there had been a threat to burn the house. Roberto's party was shot at and bombarded with rocks, bats, and gas bombs, so one of the party who had a gun fired in the air. Roberto took the man's gun.[20] Roberto claimed a Fifth Amendment

---

[19] No objection was taken to the judge's charge; and on this appeal the defendant appears not to question that the instructions defining the offenses were apposite (as well as substantively correct) if the homicide could be brought home to the defendant on the facts.

[20] At a later point in his testimony, Roberto refused to say he did this, and claimed a privilege as to the question whether he had a gun.

privilege[21] as to what happened to the gun, but did state that he did not know who the person was who had the gun and that the defendant was not that person and had no gun. Roberto and the defendant returned to 81 Chippewa. Then they took a ride by the church on Lawrence Street, drove to the Prince macaroni warehouse, and again returned to 81 Chippewa. Roberto declined to say what happened at the warehouse; and having first said the stop there occurred at 11:15 P.M., he later declined to give a time. Around 1 A.M. a lot of shooting was heard. The defendant was then in the house. Seizing bats and rocks, Roberto, the defendant, and others hurried to the scene on Shaughnessy Terrace and saw a girl lying on the sidewalk. They returned to 81 Chippewa. Roberto drove his mother Juana to Miriam Toruelas's house three miles away, outside the project. The defendant was in the car with others. It was on the return to 81 Chippewa that the police inquired about the defendant and drove off with him.

There was further testimony by members or friends of the Curet family to the general effect that the defendant was with them at the Chippewa address when the fatal shooting occurred.[22]

We need not dwell on the inconsistencies between the Commonwealth's evidence including the defendant's statements, on the one hand, and the testimony of the defense witnesses, especially Roberto, on the other. A jury, making comparisons and considering the whole picture, very reasonably could accept the prosecution's version of the homicide and reject the attempted exculpatory

[21] Separate counsel was assigned by the judge to advise Roberto with regard to his testimony.

[22] But this testimony appears to put the defendant at the front of the house in sight of these witnesses at the time, whereas the defendant's . written statement puts him upstairs in the bathroom; and the testimony is also inconsistent with the defendant's written statement as to what occurred when he reached the victim's body.

explanations. On the present record the selective process including the assessment of the credibility of witnesses was for the jury. See *Commonwealth* v. *Johnson*, 372 Mass. 185, 189-191 (1977); *Commonwealth* v. *Forrester*, 365 Mass. 37, 46-47 (1974).

4. *Other contentions.* The defendant assails the proceedings at trial but the attack is rather indiscriminate and mostly unsupported by specific objections or exceptions on the record.

First is the complaint that the prosecutor appealed in his questioning of witnesses and closing argument to any latent bias the jurors may have had against Puerto Ricans. During the early stages of the proceeding, the defense objected to any reference to the fact that a given witness or group was Puerto Rican; but in a case with a background of racial or ethnic strife any such attempted denaturing of the evidence would simply falsify the situation (compare *Commonwealth* v. *Johnson*, 372 Mass. 185, 197 [1977], with *Commonwealth* v. *Graziano*, 368 Mass. 325, 331-332 [1975]); quite possibly it would turn out damaging to the defendant's own couse. The defendant tends to construe a severe cross-examination of a Puerto Rican witness or a criticism of his testimony in the closing argument as a devious incitement of the jury. We do not read the record that way. At one point the prosecutor would perhaps have done better to lay less stress on the fact that a defense witness was Puerto Rican, but the fault, if there was one, appears venial and not material in the context of the entire case.[23] The defense tries to make something on this appeal of the prosecutor's failure to produce a written statement supposed to have been given to the police by the Commonwealth witness Stephan Murphy. After inquiries, the prosecutor doubted that a statement had been given, and in any event he could not find it. The defense chose not to pursue the matter beyond the prosecutor's explanation, which the

---

[23] The reference is to the witness Pedrosa, see note 18, *supra.*

judge accepted.[24] The prosecutor is criticized, further, for having expressed his personal opinion of the guilt of the defendant, but we think the charge is unfounded.

In his turn the judge is criticized for admitting testimony about too many of the events of May 10-11 preceding the homicide. This grievance—notably weak when it comes to particularizing what should have been excluded —overlooks the breadth of discretion allowed a judge in admitting penumbral evidence especially where motive and credibility of witnesses are in issue. See *Commonwealth* v. *Harris, ante* 201, 206-207 (1978); *Commonwealth* v. *Durkin,* 257 Mass. 426, 428 (1926); W. B. Leach & P. J. Liacos, Massachusetts Evidence 293-296 (4th ed. 1967). In fact the defense seemed, understandably, as much interested in developing this material as the prosecution. We find no substance in the claim that the judge limited unduly the cross-examination of witnesses by the defense. Nor was there error in allowing the defense witness Roberto Curet his privilege as far as he claimed it. It was the defense that offered this witness and in doing so itself recognized that at certain points the witness might be incriminating himself if he gave truthful answers. The judge proceeded cautiously and instructed the jury promptly and correctly that they were not to raise an inference against the defendant because the witness was invoking a constitutional privilege. See *Commonwealth* v. *Ries,* 337 Mass. 565, 586 (1958); 8 J. Wigmore, Evidence § 2272 (McNaughton rev. ed. 1961).

We discern no material error in the judge's final charge to the jury.[25] The judge is attacked for failing to follow the

---

[24] There is no more merit in the criticism of the prosecutor for referring to statements given to the police by the witnesses Lowe and Saab.

[25] Although, as noted, the judge's instructions were not objected to, the defendant now criticizes the remarks on a defendant's right of appeal, cf. *Commonwealth* v. *Walker,* 370 Mass. 548, 574-575, cert. denied, 429 U.S. 943 (1976), on reasonable doubt, and on the use that

settled practice in this Commonwealth, though not constitutionally required,[26] of putting the question of the "voluntariness" of a confession to the jury even after the judge has ruled for the Commonwealth on that point at voir dire. Arguendo we assimilate the present defendant's statements to a "confession" for the present purpose (cf. *Commonwealth* v. *Mahnke*, 368 Mass. 662, 679 n.24 [1975], cert. denied, 425 U.S. 959 [1976]), and we pass over the fact that there was no objection or exception to the failure to submit to the jury. The overriding consideration is that there is no duty to ask the jury to pass on voluntariness unless it is made a live issue at trial. Thus we said in *Commonwealth* v. *Pratt*, 360 Mass. 708, 714-715 (1972) (quoting from *Stevenson* v. *Boles*, 331 F.2d 939, 942 [4th Cir.], modified and aff'd, 379 U.S. 43 [1964]), "We conclude that after the voir dire the question of voluntariness was not 'raised with sufficient point to require an express admonition to the jury by the Court [on its own motion].' " See *Commonwealth* v. *Preece*, 140 Mass. 276, 277 (1885). Cf. *Commonwealth* v. *Johnson*, 352 Mass. 311 (1967), cert. dismissed, 390 U.S. 511 (1968). It is indicative of the falling away of this issue that on the present appeal the defendant, in urging that his statements and the sequelae should have been suppressed, lays his emphasis on the formal point of the illegality of the arrest that supposedly preceded the statements, rather than on a claim that the defendant was overborne and deprived of will when he made the statements. The case of *Commonwealth* v. *Harris*, 371 Mass. 462 (1976), is consistent with the view taken here.

We are asked to reverse the judgments because—the argument goes—it appears on the face of the record, without more, that the defendant's representation below by appointed counsel fell below the constitutional standard

the jury could legitimately make of Pedrosa's testimony (see note 18 *supra*). The criticisms are without substance.

[26] See *Commonwealth* v. *Johnston*, 373 Mass. 21, 24 (1977); *Lego* v. *Twomey*, 404 U.S. 477, 489-490 (1972).

of professional adequacy. See *Commonwealth* v. *Adams*, 374 Mass. 722, 727-729 (1978); *Commonwealth* v. *Saferian*, 366 Mass. 89, 96 (1974). So far as specifics can be pointed to, the claim is not made out. Nor are we prepared to accept the proposition that in the nature of things the defendant could not have been adequately represented by an attorney unable to communicate directly with him in Spanish. (In fact it is understood that the defendant was offered a Spanish speaking attorney but favored the attorney who was appointed and appeared for him.)

As already intimated, we find no basis in the record for mitigating the punishment or taking other action under G. L. c. 278, § 33E.

*Judgments affirmed.*