COMMONWEALTH vs. WILLIAM A. COLE.

Hampden.   November 6, 1979. — March 5, 1980.

Present: HENNESSEY, C.J., QUIRICO, KAPLAN, WILKINS, & ABRAMS, JJ.

*Practice, Criminal,* Directed verdict, Instructions to jury, Capital case, Psychiatric examination. *Insanity. Homicide. Evidence,* Admissions and confessions. *Constitutional Law,* Admissions and confessions. *Witness,* Expert.

At a criminal trial at which three medical experts testified that the defendant was not criminally responsible for his conduct, there was sufficient lay testimony to support the jury's conclusion that the defendant's conduct exhibited an ability to control his behavior and an awareness of the wrongfulness of his conduct. [35-38]

A judge did not err in denying a defendant's motions for new trial on the ground the verdicts were against the weight of the evidence despite the fact that there was unanimous psychiatric testimony that the defendant was not criminally responsible for his conduct. [38]

This court exercised its power under G. L. c. 278, § 33E, to reverse a conviction where the judge failed to instruct the jury to consider whether the defendant's confession was the product of a rational intellect and where there was extensive psychiatric evidence of the defendant's insanity presented at trial. [38-43]

INDICTMENTS found and returned in the Superior Court on October 13, 1977.

The cases were tried before *Tisdale, J.*

*John F. Donahue* for the defendant.

*Dianne M. Dillon,* Assistant District Attorney, for the Commonwealth.

ABRAMS, J.   After the lunch break at the American Bosch Company's plant on October 10, 1977, William Cole fatally shot Thomas Coppola.   Cole then chased Joaquim Goncalves, shot Goncalves twice, and when Cole's rifle misfired on the third shot aimed at Goncalves, Cole struck Goncalves on the head with the butt of the rifle.   Coppola was Cole's

general supervisor; Goncalves was Cole's foreman. At trial the sole issue was Cole's criminal responsibility. After fifteen hours of deliberation, a jury found Cole criminally responsible by convicting him of three criminal charges: murder in the first degree, armed assault with intent to murder and assault and battery by means of a dangerous weapon.[1] Cole appeals. See G. L. c. 278, §§ 33A-33G.

Cole claims that the trial judge erred in denying his motions for directed verdicts and motions for a new trial.[2] We find no error in the denial of Cole's motions. Cole also asks us to exercise our power under G. L. c. 278, § 33E, because the verdicts are against the weight of the evidence. We do not consider this argument because we reverse pursuant to our plenary review power under § 33E for an error of law: the psychiatric evidence placed in issue the voluntariness of Cole's confession, and the judge failed to instruct the jury on that issue. See *Commonwealth* v. *Chung*, 378 Mass. 451, 456-458 (1979). Cf. *Commonwealth* v. *Alicea*, 376 Mass. 506, 522-523 (1978).

The Commonwealth's evidence showed that sometime before 11 A.M. Cole told a fellow worker that he was going to kill Goncalves and Coppola. At that time Cole was "shaking."[3] Cole then left the plant and returned around 11:30 A.M., leaving his car double parked outside. Cole entered the plant, approached Goncalves, and asked for a meeting with him (Goncalves) and Coppola. Cole's speech was clear, but he was "not calm." Goncalves was unable to arrange an immediate meeting and Cole walked off. Short-

---

[1] On the conviction of murder in the first degree, the judge imposed the mandatory life sentence. The judge imposed a sentence of eighteen to twenty years on the armed assault with intent to murder and nine to ten years on the assault and battery by means of a dangerous weapon. All sentences were to be served concurrently.

[2] Separate motions were filed as to all indictments. Although the defendant's argument in his brief refers to motion in the singular, we take his arguments as alleging error in denial of the motions on each of the three indictments.

[3] There had been some type of disagreement early on the morning of October 10, 1977, involving Coppola, Goncalves and Cole.

ly thereafter Cole reentered the plant, armed with a .22 caliber rifle. The men in the shop stopped working to see what, if anything, would happen. Cole walked up to the spot where Coppola and Goncalves were working and said to them, "I'm going to kill you two guys."

Ronald Roux, who was running a nearby machine, started to move away, but Cole said very calmly, "Get back to your machine, I don't want no trouble with you." Michael Swiatlowski, who had been standing next to his machine alongside Coppola and Goncalves, started to run away, but Cole also told him to stay put: "Don't you go anywhere. I'm not mad at you, I'm mad at these two guys."

From where he stood, Swiatlowski heard Cole say, "I'm going to kill you [Coppola] first, then I'm going to kill Jack [Goncalves] second." "I've got enough of you. I think I'm going to shoot you. So I'll shoot you now." Cole told Coppola and Goncalves: "You gave me a hard time this morning, I'm going to give you a hard time now." Cole refused to put the gun away, because he said they (Coppola and Goncalves) would "fire him." Coppola then demanded that Cole give him the rifle and stepped toward Cole to try to disarm him. At that time, Cole fired the rifle, thereby slaying Coppola.

Goncalves ran out a nearby alley door, pursued by Cole. Cole followed Goncalves down the alley, firing at him as he ran back into the plant. Cole continued to chase Goncalves. Once inside the plant, Goncalves kept running, telling people to call the guards. Cole fired at him again, and Goncalves fell to the floor. Cole put the gun to Goncalves' heart and fired, but Goncalves twisted away so that the bullet entered through the abdomen instead. The gun jammed when Cole tried to fire a third time, and Cole then smashed the butt of the rifle into Goncalves' skull.

The Springfield police[4] arrived at the Bosch plant at approximately noon. They found the defendant standing

---

[4] The American Bosch plant straddled the Springfield-Chicopee line. Although the Springfield police were the first to arrive at the scene, and consequently took the defendant into custody, the crimes actually took place in Chicopee. Thus, the investigation fell within the jurisdiction of the Chicopee police.

with the gun pointed to his chest, his finger on the trigger.[5] Cole did not surrender the weapon until he arrived at the police station. The jury heard a tape recording of the Springfield police reading Cole the Miranda warnings, which took place at the station. Cole responded to the warnings by requesting a lawyer so that "everything will be nice and legal." When the police then asked if Cole wanted to "tell [his] story," Cole replied, "No, do you want to go by the law?" Cole then asked for a public defender because he couldn't afford a lawyer. Cole was booked and gave responsive answers to the usual booking questions, such as name, address, age, height, eye and hair color.

After being taken into custody by the Chicopee police, Cole was again read the Miranda warnings. Cole signed a Miranda card and then told police that he had "shot both persons." He had started to give the police a formal statement when defense counsel called the station and the interview stopped.[6] The police testified that the defendant's behavior and physical appearance seemed normal, that his speech was not impaired, and that he appeared to understand and respond to what was being said to him. The officers testified that Cole did not appear confused or unsteady in any way.

During the Commonwealth's case, the evidence showed that Cole and Goncalves had a series of disagreements over the number of machines Cole could operate simultaneously. Goncalves, as Cole's foreman,[7] had restricted Cole to operating the machines separately. Since salaries were comput-

---

[5] The defendant told one of the psychiatrists that he tried to shoot himself, but the gun jammed.

[6] Before the interview was stopped, Cole had said, "I didn't do this just for myself, but for the other people at the . . . ." The typewritten text of this half-line statement was admitted as an exhibit at voir dire and trial, although the record before us reveals that there was no oral testimony as to the typed portion of Cole's statement to the Chicopee police.

[7] Goncalves had become foreman in August, 1977. Cole thereafter transferred out of Goncalves' department and into the spray painting department. Due to company policy, Cole returned to Goncalves' department on October 5, 1977.

ed on a piecework basis, Cole thereby sustained a substantial loss in pay.

On October 5, 1977, Cole had a dispute with Goncalves and Coppola over the quality of Cole's work. Cole worked only a half day the following day, a Thursday, and he did not report for work at all on Friday.

At the close of the Commonwealth's case, the defendant filed motions for directed verdicts of not guilty by reason of insanity. The motions were denied and exceptions taken.

*The defense.* The heart of the defense was the presentation of three medical experts who all testified that the defendant was not criminally responsible for his conduct on October 10, 1977.

On October 11, 1977, Cole was arraigned at District Court of Chicopee. The District Court judge ordered an immediate psychiatric examination pursuant to G. L. c. 123, § 15(a), which was performed on October 11, 1977, by a court psychiatrist. The court psychiatrist found Cole competent to stand trial, but he questioned Cole's criminal responsibility. Cole was thereafter committed to Bridgewater State Hospital for further psychiatric observation and examination.

Twenty-eight days after Cole's arrival at Bridgewater, Dr. Stephen G. Cronin, who was then director of forensic services at Bridgewater, conducted a competency and criminal responsibility examination. Based on what Cole told him, Cronin determined that Cole was not competent to stand trial and that Cole was not criminally responsible for the crimes. He diagnosed Cole's mental illness as either a psychotic depressive reaction or a schizo-affective reaction with paranoid thinking. At trial Cronin testified that Cole's behavior "was entirely consistent with an acute psychotic episode" suffered on the day of the crime.

Dr. Daniel M. Weiss testified that in his opinion the defendant lacked criminal responsibility because of an acute psychotic reaction which had since subsided, and that as a result of this psychosis, the defendant had little or no memory of the events of October 10, 1977. Dr. Weiss did not examine the defendant until September 8, 1978, when he

interviewed him for approximately one hour; he saw Cole again on November 10, 1978.[8] He testified that his opinion was based on information Cole had given him in those two interviews, on the grand jury statements of some witnesses and on the Bridgewater reports. A third doctor also testified that in his opinion Cole lacked criminal responsibility for the crimes.

Additionally, there was evidence of labor unrest in Cole's department at American Bosch. The defense elicited evidence, which, if believed, permitted the jury to find that Goncalves discriminated against blacks and that he discriminated against Cole, who is black, in particular. A number of workers told of Cole's anger and frustration over alleged mistreatment by Goncalves and Coppola. The defense also presented evidence that from the time Cole's first wife died in 1973, Cole was nervous, depressed, anxious and had health problems.

1. *Denial of motions for directed verdicts.* In alleging that the judge erred in denying the defendant's motions for directed verdicts, made at the close of the Commonwealth's case and renewed after the defense rested, the defendant asks us to reconsider our previous rulings on the issue of a directed verdict of not guilty by reason of insanity if the Commonwealth fails to produce expert testimony on the issue of criminal responsibility. See, e.g., *Commonwealth* v. *Kostka,* 370 Mass. 516 (1976); *Commonwealth* v. *Smith,* 357 Mass. 168 (1970); *Commonwealth* v. *Cox,* 327 Mass. 609 (1951). We most recently considered this issue in *Commonwealth* v. *O'Brien,* 377 Mass. 772, 779-780 (1979), and there declined to abandon this rule. We see no reason to reconsider our decision.

The Commonwealth's evidence of sanity came from the witnesses at the scene of the crime and from the police. The evidence warranted a jury in finding that Cole deliberately and with premeditation shot the two men. The evidence

---

[8] The November 10 interview was done expressly to determine the defendant's competency to stand trial.

also warranted a jury in finding that at the time of the crime
Cole was able to converse clearly and was oriented as to
time, place and persons. Cole was able to tell fellow
workers that he had no quarrel with them; he appeared to
be aware of what he was doing. Further, Cole's responses[9]
to the police indicated that he was lucid and able to respond
to what was said to him. Finally, there was no medical his-
tory of any prior psychiatric treatment.[10] The Common-
wealth's evidence of sanity through "the testimony of lay
witnesses who observed a defendant at relevant times, the
evidence as to the circumstances of the commission of the
crimes, [and] the lack of any medical history . . ." *Blaisdell*
v. *Commonwealth,* 372 Mass. 753, 765-766 (1977), was
more than ample to warrant the verdicts. See *Common-
wealth* v. *O'Brien, supra* at 781-782.

The defendant claims, however, that the testimony of the
three doctors compels a conclusion that the lay testimony
was insufficient to support a finding of sanity beyond a
reasonable doubt. We disagree.

The psychiatric testimony of the three experts was cast in
doubt by cross-examination of the witnesses.[11] In our view,

---

[9] The Commonwealth offered Cole's responses to show his "state of
mind," and to show that Cole "clearly understood what he was doing."
The evidence was also offered to prove that Cole, "at the important times
. . . was in fact not psychotic, but was, in fact, sane."

[10] This factor, in addition to our analysis of the proffered psychiatric
evidence *infra,* distinguishes the instant case from cases such as *Common-
wealth* v. *Kostka,* 370 Mass. 516, 539 (1976) (Hennessey, C.J., dissenting
in part), and *Commonwealth* v. *Walker,* 370 Mass. 548, 584 (Hennessey,
C.J., dissenting in part), cert. denied, 429 U.S. 943 (1976).

[11] One doctor had limited experience in forensic psychiatry and his testi-
mony on the issue of criminal responsibility was not phrased in terms of
the test required under *Commonwealth* v. *McHoul,* 352 Mass. 544, 546-
547 (1967). Cf. *Commonwealth* v. *Laliberty,* 373 Mass. 238, 240-241
(1977). The second psychiatrist based his conclusion on the ground that
"[i]t all sounds crazy," that it was "inconsistent with the kind of person
that [Cole] is," and that Cole's lack of secretiveness about his criminal ac-
tivity indicated a lack of criminal responsibility. The doctor based that
part of his opinion on "statistics." The third psychiatrist indicated that
his original diagnosis was based solely on the two hour examination of
Cole. The doctor added that the defendant's exposure to toxic paint fumes at

the psychiatric evidence of temporary insanity, albeit unanimous, simply was not so compelling as to create "the strong belief that [the verdicts were] not due to a careful consideration of the evidence, but . . . [were] the product of bias, misapprehension or prejudice." *Commonwealth* v. *Mutina*, 366 Mass. 810, 816 (1975). See *Government of V.I.* v. *Downey*, 396 F. Supp. 349 (D.V.I.), aff'd, 529 F.2d 511 (3d Cir. 1975) (finding of sanity warranted based on lay testimony and weakness in psychiatric testimony); *People* v. *Harrington*, 22 Ill. App. 3d 938, 944 (1974) (lay testimony as to the defendant's appearance and conduct at the time of the crime sufficient to support finding of sanity). See generally *Commonwealth* v. *Kostka*, 370 Mass. 516, 535-536 (1976); *United States* v. *Dube*, 520 F.2d 250, 252 n.1 (1st Cir. 1975), quoting *Mims* v. *United States*, 375 F.2d 135, 143-144 (5th Cir. 1967).

The defendant's evidence as to frustration and anger over alleged mistreatment by Goncalves and Coppola, as well as testimony from friends, relatives and coworkers as to the defendant's depression, nervousness, anxiety, and health problems since 1973 could have been rejected by the jury in view of the witnesses' relationship to the defendant.

To the extent that the evidence permitted conflicting inferences, it is for the jury to determine the issue of responsibility. There was ample lay testimony to support the jury's conclusion that Cole's conduct exhibited an ability to control his behavior and an awareness of the wrongfulness of his conduct. The testimony of the witnesses who saw Cole at the time of the offenses and immediately thereafter ade-

---

the Bosch plant might suggest an organic basis for his psychosis. On recross-examination the doctor's theory about paint fumes as a contributing factor in the defendant's mental disease was shown to be based primarily on lay knowledge rather than medical expertise. The doctor claimed to know about the toxic elements in a paint shop "because my brother painted cars . . . [f]or about two years. And my sister's boyfriend has a paint shop . . . ." The doctor added that he looked up in a medical textbook the toxicity of the elements present in the paint used at the Bosch plant before testifying, although he had no knowledge of the quantum of toxic fumes Cole might have inhaled.

quately rebutted the testimony of the experts on the issue of sanity.

2. *Denial of motions for new trial.* The defendant asserts that it was error for the trial judge to deny his motions for new trial because the verdicts were against the weight of the evidence. The defendant's claim is based on the unanimous psychiatric testimony. We do not find the psychiatric testimony so compelling that the judge's decision was arbitrary and capricious and "not a thoughtful and reasoned decision designed to reach a just result." *Commonwealth* v. *Gibbons,* 378 Mass. 766, 772 (1979). *Davis* v. *Boston Elevated Ry.,* 235 Mass. 482, 496-497 (1920).

3. *Review pursuant to G. L. c. 278, § 33E.* This court has the obligation pursuant to § 33E[12] to broadly consider the whole case on the law and the facts, and "[u]pon such consideration the court may, if satisfied that the verdict was against the law or the weight of the evidence, . . . or for any other reason that justice may require (*a*) order a new trial or (*b*) direct the entry of a verdict of a lesser degree of guilt . . . ." G. L. c. 278, § 33E. Although we have sometimes said that in the absence of an objection and exception, this court will find reversible error under G. L. c. 278, § 33E, "only 'upon a showing of grave prejudice or substantial likelihood that a miscarriage of justice has occurred,'" *Commonwealth* v. *Garcia,* 379 Mass. 422, 439 (1980), quoting *Commonwealth* v. *Roberts,* 378 Mass. 116, 123 (1979), the scope of § 33E review is, in fact, broader. "The search under § 33E is a more general and an obligatory one for a result that may be 'more consonant with justice.'" *Commonwealth* v. *Davis, ante* 1, 15 n.20 (1980), quoting from *Commonwealth* v. *Seit,* 373 Mass. 83, 94 (1977). General Laws c. 278, § 33E, "operates as a type of 'safety valve' by ensuring review as to all aspects of cases regardless of the absence of claim of error." *Commonwealth* v. *Brown,*

---

[12] General Laws c. 278, § 33E, was amended by St. 1979, c. 346, § 2, to eliminate the broad review of convictions of murder in the second degree. See *Commonwealth* v. *Davis, ante* 1 (1980).

376 Mass. 156, 168 (1978). See *Commonwealth* v. *Hall,* 369 Mass. 715, 736 (1976) ("The broad scope of the review which this court is required to make under G. L. c. 278, § 33E, in a capital case is not limited to questions based on exceptions saved during the course of the trial"). See also *Commonwealth* v. *Williams,* 364 Mass. 145, 151 (1973). In short, while recognizing that the power of this court under § 33E is to be exercised with restraint, *Commonwealth* v. *Hooks,* 375 Mass. 284 (1978), we have not hesitated to act under § 33E in appropriate cases in which the record discloses an error of law. We conclude that this is such a case.

At the request of defense counsel the judge held a voir dire at trial to consider the question whether Cole's confession to the Chicopee police was voluntary. The defendant presented expert testimony at the voir dire that he did not have the capacity to waive his rights freely, knowingly, and intelligently. The judge ruled that the defendant "understood his rights as given to him . . . and that he talked freely, willingly, and knowingly thereafter, realizing the situation." The judge expressly ruled that the defendant's "mind was not overridden or impaired in any way, shape or fashion by psychosis of any kind — and I use that word broadly speaking to mean any kind of mental illness or insanity." The defendant recorded a "blanket" objection to the admission "of these things [statements] . . . [because Cole] was not in full possession of his faculties." Moreover, defense counsel also objected on this same basis to the admission of Cole's statements as they were offered during the Commonwealth's case in chief.

However, in his instructions, the judge did not inform the jury that, before they could consider evidence of Cole's confession to the Chicopee police that he "shot both persons," they must first determine whether the confession was voluntary. We think that it was error for the judge to fail to submit to the jury the question whether Cole's confession was the product of a rational intellect. Our "humane practice" requires that "when statements amounting to a confession

are offered in evidence, the question whether they were voluntary is to be decided at a preliminary hearing by the presiding judge in the absence of the jury. If he is satisfied that they are voluntary, they are admissible; otherwise they should be excluded. If the judge decides that they are admissible, he should then instruct the jury not to consider the confession if, upon the whole evidence in the case, they are satisfied that it was not the voluntary act of the defendant." *Commonwealth* v. *Marshall,* 338 Mass. 460, 461-462 (1959), and cases cited therein. While this so called "Massachusetts practice" was approved in *Jackson* v. *Denno,* 378 U.S. 368, 378 (1964), the second prong of it — jury reconsideration — is not constitutionally mandated. See *Lego* v. *Twomey,* 404 U.S. 477, 489-490 (1972); *Commonwealth* v. *Garcia,* 379 Mass. 422, 442 n.13 (1980); *Commonwealth* v. *Harris,* 371 Mass. 462, 474 (1976). We think that such reconsideration was compelled as a matter of Massachusetts practice in view of the fact that the psychiatrists were of the opinion that the confession and the waiver of the Miranda warnings were consistent with the defendant's claim of lack of criminal responsibility.[13]

While there is no duty to ask the jury to pass on voluntariness unless it is made a live issue at trial, *Commonwealth* v. *Alicea,* 376 Mass. 506, 522-523 (1978), "if credible evidence of insanity at the time of the confessions is presented to the jury, our practice requires jury reconsideration as to the question of the defendant's rationality, . . . 'as part of the issue of voluntariness.'" *Commonwealth* v. *Chung,* 378 Mass. 451, 456-457 (1979). The issue of insanity at the time of a confession can be raised by evidence of insanity, "prior to, during, and after the commission of the crimes," at least

---

[13] One of the experts testified that conversation which showed logical reasoning was not necessarily inconsistent with psychosis, "because it doesn't necessarily mean that he was really aware, had good insight into the nature of it and the possible consequences of what he had done." He also testified that the defendant might have had periods of lucidity. Another expert testified that a psychotic can make intelligent statements and carry out certain acts even under a delusion.

where the confession takes place shortly thereafter. *Id.* at 457. See *Commonwealth* v. *Johnston*, 373 Mass. 21 (1977); *Eisen* v. *Picard*, 452 F.2d 860, 864-865 (1st Cir. 1971), cert. denied, 406 U.S. 950 (1972). Thus, evidence of insanity usually raises the issue of voluntariness. Cf. *Commonwealth* v. *Alicea*, 376 Mass. 506, 522-523 (1978).

Moreover, in this case, the failure to request jury consideration of the issue does not bar relief because "[i]n light of the extensive psychiatric evidence of involuntariness [insanity] which was presented at trial, . . . the judge had an independent obligation to instruct the jury to consider the voluntariness of the confession." *Commonwealth* v. *Chung*, *supra* at 458 n.8. The judge's failure to instruct the jury in this case to consider whether the confession was the product of a rational intellect requires reversal of the conviction of murder in the first degree, as well as the other two convictions, since the error affected the entire trial. *Commonwealth* v. *Roberts*, 378 Mass. 11N, 123 (1979). *Commonwealth* v. *Freeman*, 352 Mass. 556, 563-564 (1967).

The Commonwealth also offered in evidence a recording of Cole's responses to the Miranda warnings at the Springfield police station. After the voir dire,[14] the judge ruled

---

[14] Since the judge considered Cole's responses to the Miranda warnings during the voir dire, we reserve the question left open in *Commonwealth* v. *Williams*, 379 Mass. 600, 605 n.1 (1980), namely, "whether the voir dire requirement of *Chung* and *Harris* applies to the admission, under a limiting instruction, of . . . statement[s] such as [Cole's responses to the Miranda warnings] . . . ."

Further, on the facts of this case, once the responses were admitted, the jury could have found the defendant's statements to be involuntary only on the basis that the responses were not the product of a rational intellect. If the jury reached that conclusion, no prejudice to the defendant could arise if the jurors considered the responses on the issue of criminal responsibility, since such a conclusion would undermine the Commonwealth's claim that the defendant was criminally responsible. Hence, there was no need to instruct the jurors to exclude from their deliberations consideration of the defendant's responses if they found the responses were not the product of a rational intellect (i.e. involuntary). Thus, on this record, jury reconsideration in accord with our "humane practice" would not have served its purpose of benefiting a defendant. We need not decide whether, and in what circumstances, jury reconsideration may be re-

that all of Cole's statements were voluntary.[15] Cole's tape recorded responses were admitted as testimonial evidence on the issue of criminal responsibility. See *Walker* v. *Butterworth*, 599 F.2d 1074, 1081-1084 (1st Cir.), cert. denied, 444 U.S. 937 (1979). Cf. *Blaisdell* v. *Commonwealth*, 372 Mass. 753, 760 (1977). See note 9, *supra*. The sole value of Cole's responses was the inference that could be drawn from them on the issue of criminal responsibility.[16] The judge did not give the jury a limiting instruction on the use of Cole's responses, and the defendant did not request a limiting instruction. Cf. *Commonwealth* v. *Monsen*, 377 Mass. 245, 253 (1979) (ordinarily a judge has no obligation to instruct the jury sua sponte as to the purposes for which evidence is offered at trial). The record, however, reveals that the jurors were not misled as to the limited use of the evidence. The prosecutor argued the defendant's responses in his summation,[17] and the jury, during its deliberations, asked

---

quired when evidence not amounting to a confession is offerd on the issue of criminal responsibility. See *Commonwealth* v. *Garcia*, 379 Mass. 422, 432-434 (1980).

[15] The judge suppressed three other statements Cole made to the police on other grounds, principally failure to comply with a pretrial discovery order. See *Commonwealth* v. *Lewinski*, 367 Mass. 889 (1975). See also Mass. R. Crim. P. 14 (a) (1) (A), 378 Mass. 874 (effective July 1, 1979).

[16] A refusal to talk to police without counsel is not ordinarily admissible. *Commonwealth* v. *Sazama*, 339 Mass. 154, 156-159 (1959). *Commonwealth* v. *Burke*, 339 Mass. 521, 531-533 (1959). But see *Commonwealth* v. *Hall*, 369 Mass. 715, 732-734 (1976).

[17] "The police pick him up, they advise him of his rights. I understand my rights. Do you know you have the right to a lawyer? I understand. Do you want a lawyer? Yeah, I want a lawyer. I want to do this thing legal — Cole says. The day of the shooting, an hour later. I want this thing done legal, I want a lawyer. I want to tell the world about what I just did for my fellow workers and myself.

"Well, do you have a lawyer? No, I want the public defender because I can't afford a lawyer, he says. You heard that. Are those the words of someone who is temporarily insane?

"Those are the words of the rebel, the anti-social animal, of the killer. That's what we have, pure and simple, premeditated murder with malice aforethought."

the judge if they could hear the police tapes of Cole's responses to the Miranda warnings again. At the same time, the jury also requested reinstruction on criminal responsibility. The judge did furnish the jurors with a transcript of tapes and also instructed them on the law governing criminal responsibility a second time. Thus, in light of the importance attached to these statements by the Commonwealth and the jury, we think it would have been better procedure for the judge to have carefully instructed the jury that Cole's responses could be used by them only on the issue of criminal responsibility, and not as evidence of guilt.

In conclusion, it was error requiring reversal not to submit to the jury the question whether Cole's confession was the product of a rational intellect. Accordingly, the judgments are reversed, the verdicts are set aside, and the case is remanded to the Superior Court for a new trial.

*So ordered.*