COMMONWEALTH vs. WILLIAM TYREE, JR.

Middlesex.   April 5, 1982. — August 23, 1982.

Present: HENNESSEY, C.J., LIACOS, ABRAMS, NOLAN, & LYNCH, JJ.

*Homicide. Practice, Criminal,* Comment by judge, Indictment, Joint
    enterprise, Instructions to jury, Voluntariness of statement, Admis-
    sions and confessions. *Evidence,* Anonymous statement.

In the circumstances, there was no merit to a criminal defendant's con-
    tention that the trial judge's remarks to two separate venires enhanced
    the Commonwealth's case, and thereby constituted material prejudi-
    cial error.  [205-209]
At the trial of an indictment for first degree murder, no substantial risk
    of a miscarriage of justice resulted from the unobjected-to admission of
    a statement, given by the defendant to a correction officer, purporting
    to be the dying declaration of its anonymous author exonerating the
    defendant from participation in the murder, where the voluntariness
    of the delivery of the statement was not a live issue in the case, and
    where the jury reasonably could have inferred that the defendant was
    responsible for drafting the statement with the design of misleading in-
    vestigators.  [209-214]
Where the voluntariness of a statement received by prison officials from
    a criminal defendant, purporting to be the dying declaration of its
    anonymous author exonerating the defendant from participation in
    the murder with which he had been charged, was not a live issue at
    trial, the judge had no duty to instruct the jury with respect to the ra-
    tionality of its maker; nor did the judge err in instructing the jury that
    they could not consider the statement for any purpose unless they
    found that the defendant had written or procured it.  [214-215]
At a murder trial, no substantial risk of a miscarriage of justice resulted
    from the judge's failure to make, in accordance with the Massachusetts
    "humane practice," an initial finding as to voluntariness, and to in-
    struct the jury respecting voluntariness, of noncustodial statements
    made by the defendant in a hospital emergency room, where, even if
    the admission of the statements was error, they were merely cumula-
    tive of other statements of the defendant, and where the record in-
    dicated that defense counsel had made a reasonable tactical decision to
    concede their admission in order to increase the likelihood of admis-
    sion of the defendant's hospital records.  [215-218]

At a murder trial, the judge did not err in denying the defendant's motion for a required finding of not guilty where evidence was such that a rational trier of fact reasonably could have found the defendant guilty of his wife's murder, either as an accessory before the fact or as a joint venturer. [218]

INDICTMENT found and returned in the Superior Court Department on May 15, 1979.

The case was tried before *Young, J.*

*Brownlow M. Speer* for the defendant.

*Robert M. Raciti,* Assistant District Attorney, for the Commonwealth.

LYNCH, J. William Tyree, Jr., was convicted of the murder in the first degree of his wife Elaine Tyree and sentenced to life imprisonment. He appeals from his conviction, alleging several errors of law and seeking review, in addition, pursuant to G. L. c. 278, § 33E. We find no error warranting either reversal or exercise of our powers under § 33E. We affirm the judgment of conviction.

The evidence against the defendant, though strong, was primarily circumstantial. Since the defendant challenges, among other things, the sufficiency of that evidence, we shall review it in some detail. The evidence introduced at trial tended to show the following.

William Tyree, Jr., and his wife Elaine were both enlisted personnel in the United States Army. The couple was stationed at Fort Devens and lived with their young child Dawn a short distance from the base in an apartment in Ayer. On January 30, 1979, Elaine was found dead in the apartment. She had been stabbed repeatedly and her throat had been cut. Two weeks later, her husband was arrested and charged with her murder. The prosecution sought to prove that the defendant did not have a good relationship with his wife, solicited a fellow soldier (one Erik Aarhus) to murder her, and hoped to profit from her death by collecting the proceeds of several insurance policies on her life.

The Tyree family's financial situation was deteriorating at the time of the murder. Elaine was scheduled to be discharged from the Army on January 30, 1979, the day of her

death. The family's income would be reduced at that time, by the amount of her salary. In addition, William Tyree had been subjected to a nonjudicial disciplinary proceeding (referred to by the witnesses as an "article 15") early in January, 1979, by his military superiors as a result of his involvement in an alleged theft of government property. Tyree had been sentenced to the loss of one month's pay and was reduced in rank from E-4 to E-1. This reduction in rank carried with it what one witness described as a "substantial loss of income." As Elaine's discharge date drew near, the Tyrees argued frequently over whether Elaine and the child should remain in the apartment in Ayer or live with relatives in Utah until the defendant could join them.

As enlisted personnel, each of the Tyrees was covered by a government life insurance policy which would pay $20,000 in the event of death. In November, 1978, the defendant contacted his insurance agent and purchased a family life insurance policy. This policy included a double indemnity provision which required the insurance company to pay $22,180 in the event of the accidental death of a family member. On January 17, 1979, an agent for a second insurance company sold the Tyrees another joint life policy which would pay $20,000 in the event of the natural death of either Elaine or William and twice that amount in the event of an accidental death.

In October or November, 1978, the defendant mentioned to Bruce Beecham, a fellow soldier, "that he [the defendant] had been with [Elaine] up on top of a hill or cliff somewhere and it would have been easy for him to let off the brake and jump from [his pickup truck]." When Beecham asked the defendant why, the defendant "mentioned a large sum of money, insurance money."

On the first or second Sunday of November, 1978, Earl Peters, a friend and fellow serviceman, had a conversation with the defendant during which they discussed hunting, four-wheel-drive vehicles, and the like. Peters testified that the defendant "wanted to know if I could hit a moving target going 55 miles an hour, going up Route 495." Peters

told the defendant that he had never done so. Later, Tyree told Peters that the target would be his wife, they would be driving in Tyree's pickup truck, and Tyree would call it a "mad sniper attack." In late November or early December, 1978, Tyree told Peters "that it would be nice if he [the defendant] could roll his truck over a mountain with his wife in it and he could get out of the truck." In the course of a third conversation, which occurred in early January, 1979, before Elaine was murdered, the defendant "asked [Peters] for an idea of where or how to obtain a [hired] gun or an assassin or something like that." Tyree told Peters that "he could't kill his wife because it would bother him," and that "he was going to see somebody or inquire about a hired gun."

On Sunday, January 28, 1979, two days before the murder, Peters observed Tyree getting into his pickup truck with Erik Aarhus, an enlisted man assigned to the "riggers" crew (which packs and repairs parachutes). Aarhus had been subjected to art. 15 disciplinary proceedings arising out of the same events for which Tyree had been demoted, and Peters had seen the pair together on other occasions. Aarhus's nickname, according to a nameplate on his desk in the rigger's shed, was "Captain Beyond." Peters yelled to Tyree and Aarhus, "Where are you going?" Tyree replied, "Negotiating." He drove off with Aarhus in the truck.

The Tyrees' apartment was located on the first floor of a multistory apartment building with four apartments on each floor. Mrs. Gibson and her eleven-year-old daughter Julie lived on the second floor of the building. On Monday evening, January 29, the defendant went to the Gibsons' apartment to ask Julie if she would babysit that evening, explaining that Elaine wanted to do some housework and that he was going to see his first sergeant. Later, while Mrs. Gibson was visiting the Tyrees, the defendant announced that he was on his way to the movies "with my first sergeant" and left the apartment. Both the sergeant in charge of the Service Company, and the sergeant in charge of the Military Intelligence Division (to which Tyree recently had been

transferred from the Service Company) denied having agreed to meet Tyree that evening. Tyree drove to Fort Devens and, after looking unsuccessfully for Earl Peters, invited another soldier to go to the movies. When the soldier protested that he did not have sufficient funds, Tyree offered to pay his way. Tyree and the soldier attended a movie theater on the base. Tyree did not return to the apartment until 10:30 P.M.

Julie Gibson, who was babysitting Dawn Tyree, brought the baby back to Elaine some time after 8 P.M. They had a conversation outside the door to the Tyrees' apartment, during which Elaine acted "kind of strange" and was "quieter than usual." Julie and Dawn then entered the Tyrees' apartment where Julie met a man who she later learned was Erik Aarhus. A conversation ensued in which Aarhus talked and acted in a vaguely threatening manner.

The next morning, Tuesday, January 30, 1979, Mrs. Gibson saw Elaine Tyree and the defendant getting into their pickup truck at 7:55 A.M. and asked for a ride to the bus station. The Tyrees dropped Mrs. Gibson off at the station at 8 A.M. Later, Barbara Eliades, whose apartment (as well as that of the Tyrees) occupied the first floor of the apartment building, saw the defendant drive into the parking lot and carry a baby carrier from his truck into the building. A short time after departing in his truck, Tyree returned with Elaine. Elaine left the truck and entered the apartment building; Tyree drove away. Mrs. Eliades then heard Elaine scream, "Get out of here and leave me alone!" A second loud scream was cut short. Mrs. Eliades telephoned the Ayer police department, then stepped across the hall and knocked on the Tyrees' door. Receiving no answer, she went down the hall to the front door of the apartment building and waited for the police.

The Ayer police department received Mrs. Eliades' call at 12:04 P.M. Officer Walter Decot arrived on the scene at 12:07 P.M. He was unable to gain entrance to the apartment. Decot went back outside, followed by Mrs. Eliades. On the ground beneath the Tyrees' first floor bedroom win-

dow, Officer Decot and Mrs. Eliades both saw a window screen. The screen had not been there when Decot entered the building.

Officer Decot soon was joined by Chief William Adamson of the Ayer police department. The landlord unlocked the apartment with his passkey. Adamson and Decot entered, and saw Elaine Tyree's body lying on the floor. She had been stabbed many times, and her throat was cut from ear to ear. The apartment was in a shambles. Neither the bedroom window nor the front door of the apartment bore any marks of a forced entry.

While Chief Adamson was in the apartment, he received a telephone call from a man who identified himself as the defendant. The chief asked the defendant to come to the apartment immediately. Officer Decot intercepted Tyree as he was leaving Fort Devens and took him to the Ayer police station. An hour later, the first of several interviews between the defendant and police officials took place.

Lieutenant Arthur Boisseau of the Ayer police department met the defendant in the conference room of the police station at 2 P.M. Boisseau, who had just returned from the Tyrees' apartment, first read the defendant his Miranda rights[1] and had him sign a card acknowledging that he understood those rights. Boisseau then asked the defendant what time he had dropped off his wife. Tyree said 12:04 P.M., and volunteered that he had not gone into the apartment, but had returned to Fort Devens. When asked what time he had arrived at the base, the defendant said that at 12:15 P.M. he was talking to a Captain Klein who had asked him for the time. Boisseau then informed Tyree that his wife was dead.

Later that day, officers of the Ayer and the Massachusetts State police again interviewed the defendant. Captain Daniel Carrigan, of the Army's Judge Advocate General's Corps,[2] also was present. After Tyree heard the Miranda

---

[1] See Miranda v. Arizona, 384 U.S. 436, 471 (1965).

[2] Carrigan, who had drafted wills for the Tyrees a few months before the murder, came to the police station at Tyree's request, but was not acting as Tyree's attorney.

warnings a second time, and again signed a waiver-of-rights form, he was asked to give an account of his whereabouts during the morning.

Tyree said that, at 5:30 A.M., he had left the apartment with his wife and daughter, taken the child to a babysitter, and dropped Elaine off at the base. He returned to the apartment. At 7 A.M., he picked up his wife at the base, and both returned home. At 8 A.M., he and Elaine went back to the base, taking Mrs. Gibson to the bus station en route. Tyree said that he was at military traffic court on the base from 9:40 A.M. to 11 A.M. At 11:10 A.M., he picked up some typewriters from a maintenance building on the base and loaded them in the back of his pickup truck.

Between 11:45 and 11:50 A.M., he met Elaine on the base. They went shopping. He drove Elaine to the apartment and saw her enter the building. He looked at his watch, which read 12:05 P.M. Tyree drove back to the base, arriving at 12:15 P.M. He said that he noted the time because a Captain Klein had asked him what time it was when he arrived. At 12:15 P.M., he unloaded the typewriters with the assistance of Bruce Beecham, another soldier. By prearrangement, Tyree called his wife at 12:50 P.M. to remind her to take the baby to the hospital for a checkup. He first got a busy signal and, after he dialed a second time, a police officer answered the phone.

Tyree was asked why he had not gone into the apartment with his wife when he took her home. He said that he had to get back to issue the typewriters, or his sergeant would be displeased. Tyree gave permission for officers to search his truck (nothing of evidentiary value was found), and agreed to give them his clothing for chemical analysis. No trace of blood was detected on his clothing or skin. Later, police officers accompanied the defendant to his apartment. Chief Adamson testified that Tyree viewed the murder scene "emotionlessly," gathered clothing for himself and the infant, and left. Tyree was returned to Fort Devens and placed under guard.

Investigation quickly revealed several inconsistencies in Tyree's first account of his activities of Tuesday morning. Captain Klein reported that when he saw Tyree enter the Military Intelligence Detachment (MID) building where they both worked, Tyree had asked *him* for the time, stating that he thought his watch might be inaccurate. Klein was not wearing a watch but agreed with Tyree that the time was about 12:15 P.M. Sergeant Henry, Tyree's supervisor, told officers that he had ordered Tyree to take several type-writers from the MID *to* the maintenance shop that morning. Henry tripped over the typewriters near Tyree's desk between 10:30 and 10:45 A.M. Henry, who knew Tyree had taken the machines from the building earlier, demanded an explanation when Tyree appeared. Tyree brushed past Henry, went into his own office, and dialed a number on the telephone. Henry ordered Tyree to report to him. Saying, "The police are at my house," Tyree handed the phone to Henry and departed.

Tyree had told Sergeant Henry earlier that morning that he was scheduled to appear in traffic court on the base at 10 A.M. At approximately 1 P.M., Sergeant Henry telephoned the traffic court and asked whether Tyree had been there that day. The person who received the call said that Tyree never showed up. Further investigation failed to substantiate Tyree's claim of having been in traffic court that morning.

The next evening, Wednesday, January 31, 1979, at approximately 6 P.M., Tyree was interviewed again by police officers. The interview took place in a conference room at the army's Criminal Investigation Division (CID) building at Fort Devens. When asked again whether he had returned to the apartment just before taking his wife there at lunchtime, Tyree admitted that he had taken a baby carrier home at 11:20 A.M. Officers inquired why he had gone to the apartment such a short time before he was to return there with Elaine; Tyree responded with a shrug. The defendant admitted that he had agreed to meet Erik Aarhus at the Tyree apartment on Monday night, January 29, to discuss their art. 15 disciplinary proceedings. He claimed to

have changed his mind thereafter, and decided to go to a movie with his wife. When Elaine chose to stay home, Tyree found another soldier to go with him.

Tyree and police officers, at Tyree's request, drove to the funeral home where Elaine Tyree's body was being prepared for burial. While officers were in the room, Tyree pulled the sheet covering Elaine's body down to her knees, kissed her on the forehead, and inspected her wounds. He asked the funeral director to turn Elaine's body over. After looking at the wounds on her back, the defendant said "he knew what kind of knife [the murder weapon] was. It was the kind of knife riggers use and he would find out who did it and take care of it his own way." One officer testified that, during his visit to the funeral home, Tyree was "very, very calm and unaffected"; Chief Adamson testified that he showed "[n]o emotion whatsoever, none." Tyree was returned to Fort Devens, and again placed under guard.

On Thursday, February 1, Dennis Testagrossa, a soldier assigned to guard Tyree, overheard a conversation between Tyree, an unidentified sergeant, and another person, during which Tyree described in graphic detail how he envisioned the murdering of his wife.[3]

---

[3] According to Testagrossa, Tyree "said that the person who murdered [his] wife was standing behind the door where there was an indentation in the wall, where there's a telephone and a rubbish barrel that sits under the phone, there's an indentation.

"He said that the murderer was standing there and that his wife had a bag of groceries. She opened the door and sat the groceries on the table, on top of the table or the cabinet, there's cabinets there. She sat the groceries there and she turned around. There was a lady next door who heard a conversation, supposed conversation. The murder[er] said to Mrs. Tyree, ['E]xcuse me.['] Mrs. Tyree said to the murder[er] 'What are you doing here?' The murderer replied, 'You know what I'm doing here.' Heard a loud scream and then that's all the lady [next door] heard.

". . . .

"She turned inside the apartment and as she turned, the murderer cut her right around, as she was turning, she bumped into a table and fell. The murderer then jumped on her back, stabbed her three times in the back, once so hard it went into the floor, then turned her over and cut her throat, stabbed her in the chest three times and opened up her stomach from here to here (indicating). And then [Tyree] said that the murderer

Elaine Tyree's funeral took place in Cumberland, Maryland (where some of her relatives lived), on Sunday, February 4, 1979. The previous day, a party of service people from Fort Devens, consisting primarily of pallbearers and a group ordered to serve as an honor guard, had travelled to Cumberland and spent the night in a motel. Tyree also attended the funeral. His behavior during his visit to Maryland was the source of much evidence introduced at trial.

At approximately 2:30 on Sunday morning, February 4, Dennis Testagrossa received a long distance telephone call from Tyree, who was in Maryland. Tyree asked Testagrossa for a "super big favor." He gave Testagrossa a telephone number and said, "Call this number and just say Aarhus did it." Testagrossa did as he was asked. The desk sergeant at the military police office at Fort Devens received a telephone call from an unidentified person in the early morning of February 4, 1979. The sergeant took the message that someone named "A-h-o-o-s-e" (the caller spelled the name phonetically) had killed Elaine Tyree, and relayed this message to the Ayer police department.

Sunday morning, before the funeral, Tyree watched the honor guard rehearse its presentation in a room in the motel. Afterward, he spoke with Robert Maguire, who was identifiable by his uniform patches as an army financial services specialist. Tyree asked Maguire "if there was going to be any problem with [life] insurance money that's paid by the government." When Maguire told Tyree that he didn't work in the insurance department, Tyree said, "Well, because you work there I figured you might know something about an investigation or something that would hold this up." Maguire replied that he did not know anything about it.

Sergeant Michael Arena, who was in charge of the honor guard, testified that on Sunday morning Tyree was "acting indifferent." Arena recounted a conversation between

jumped out a window when a lady or an old man next door saw the police enter the front door, the murderer was jumping out the back window."

Tyree and a Captain Kota on the way to the funeral, during which "Tyree was saying he knew who did it." Specialist Cecelia Vescio, a member of the honor guard, testified that Tyree earlier had told Specialist Maguire "that he knew who'd killed his wife but that the police wouldn't be able to find out because there were certain circumstances around it."[4]

That evening after the funeral, in the motel's lounge, Tyree sent two rounds of drinks to the honor guard's table, then joined the group. Sergeant Arena told Tyree that Tyree shouldn't be in the lounge because it "looks bad." According to Arena, Tyree "wanted to engage in a drinking contest." Specialist Vescio testified that Tyree announced that "he was glad this had happened because it had given us a chance to all get together and have a party."[5] Tyree told Specialist Maguire that he was thinking about renting the entire fifth floor of the motel for the evening for a party. Tyree put his hand on Cecelia Vescio's knee and asked her if she would be his woman for the night. Vescio asked Maguire to take her to her room and Maguire did so. When Maguire returned to the lounge, Tyree asked him for Vescio's room number. Maguire refused to give it to him. Tyree said, "No problem. I'll just get some women from outside, then."

Motel security personnel and Cumberland police officers entered Tyree's room with a passkey at approximately 1:30 Monday morning.[6] They found Tyree lying unconscious, face down on the bed. Tyree was taken by ambulance to the emergency room of a local hospital. Sergeant Arena and Specialist Maguire went to the hospital. When they

---

[4] Maguire did not confirm this statement during his testimony. Vescio may have overheard the statement during the defendant's conversation with Captain Kota.

[5] Other members of the funeral party testified to remarks made by the defendant indicating his lack of regret at his wife's death. This testimony was offered for its tendency to prove consciousness of guilt.

[6] Tyree later told Massachusetts police officers that he had called the motel desk and asked them to send someone to his room.

entered Tyree's cubicle in the emergency room, two order-
lies were attempting to restrain him while a nurse ap-
proached with a hypodermic. The soldiers and orderlies
rushed Tyree and held him down while the nurse gave him
an injection. At this time, Tyree made certain statements
which are discussed in greater detail later in this opinion.
Eventually, the drugs took effect and Tyree fell asleep.

That day, Monday, February 5, Tyree was admitted to
the Walter Reed Army Medical Center in Washington,
D.C., for observation. Cumberland emergency room per-
sonnel had diagnosed Tyree as suffering from "acute psy-
chosis." Walter Reed physicians diagnosed him as suffering
from acute alcohol intoxication. They released him on Feb-
ruary 9, 1979, and he was returned to Fort Devens. Later
that day, Chief Adamson spoke with Tyree at the Ayer
police station. Adamson asked Tyree if he was willing to
take a polygraph examination. Tyree replied that he would
do so, but that he was only going to answer one question:
"Did I kill her?"

Tyree was taken to Earl Peters' room in the service com-
pany barracks at Fort Devens to be guarded. The next
morning, Saturday, February 10, Peters asked Tyree what
he thought had happened to his wife. Tyree said he
thought Aarhus had killed her. Tyree also told Peters that,
while he was in Cumberland for the funeral, he had made a
down payment on a grey Corvette automobile.

At noon on Monday, February 12, the defendant again
was interviewed by police officers at the Ayer police station.
Tyree gave another, and slightly different, account of the
timing of his activities on the morning of the murder. When
confronted with the inconsistencies between his several
stories and the statements of witnesses to his activities,
Tyree finally admitted that he had met Erik Aarhus some-
time between 11 and 12 noon, within an hour of Elaine Ty-
ree's murder. Tyree said he had asked Aarhus what Aarhus
had been doing at the Tyrees' apartment Monday evening,
the day prior to her murder, and Aarhus explained that he
had been visiting the building next door. Tyree admitted

having agreed to meet Aarhus at the apartment that eve-
ning, but insisted he had later told Aarhus that he was going
to the movies instead. An officer informed Tyree that Aar-
hus claimed he wasn't visiting anyone in the next building;
he had gone there only to ask directions to the Tyrees' apart-
ment. Tyree asserted, nonetheless, that he had made it
clear to Aarhus that he should not come over that evening.
Tyree told the officers, "I think it was Aarhus. I can't ex-
plain why he was at my house the night before it happened."

After the interview, Tyree was returned to Fort Devens.
The defendant informed Peters (who was still assigned to
guard him) that he had arranged for Chief Adamson to ob-
tain the murder weapon and arrest the murderer. During a
subsequent conversation in the mess hall, Tyree asked Peters
to write down Chief Adamson's telephone number and to
call him at a certain time (Peters refused to make the call);
he also said that he was to meet Aarhus. Dennis Testagros-
sa testified that at some time during this period Tyree said
he was going to get the "murder weapon" from Aarhus, pay
him for it, and then "frame him down in the parking lot,
have the police raid it."

The next afternoon, Wednesday, February 14, Tyree set
up a meeting with Aarhus off the base and arranged to have
police officers present. When Tyree and Aarhus failed to
appear, the officers went to the CID building at Fort
Devens. Within a few minutes Tyree appeared and an-
nounced, "I've just seen the knife, the knife is in the bar-
racks under Aarhus' pillow and you'd better get down there
before it's moved." After receiving permission from mili-
tary authorities, police officers and Army Criminal Investi-
gation Division agents went to the service company bar-
racks and searched Aarhus' room. Under his pillow, they
found a knife with a four-and-one-half inch blade in a
sheath, wrapped in a plastic bag. The knife had "Captain
Beyond" inscribed on the blade and was covered with
bloodstains later determined to be of Elaine Tyree's blood
type. Officers arrested Aarhus immediately and brought
him back to the CID building within thirty-five or forty

minutes after Tyree had entered that building. Shortly thereafter, Tyree was arrested.

Tyree's explanation of Aarhus' motive for killing Elaine was that Aarhus intended to prevent her from informing the Army's Criminal Investigation Division about alleged attempts by Aarhus to extort money from the defendant.[7] Tyree claimed that, about two and one-half months earlier, Aarhus had threatened to change his statements to CID agents in order to implicate Tyree further in the alleged misappropriation of government property which had led to art. 15 disciplinary proceedings involving both Tyree and Aarhus. Aarhus demanded $25; Tyree paid him. On Sunday, January 28, Aarhus attempted to extort an additional $300 from Tyree. Tyree told his wife. On Monday night, January 29, 1979, Elaine Tyree told her husband when he returned from the movies that she had informed Aarhus of her intention to go to the CID as soon as she was discharged two days thence. Aarhus murdered Elaine the next day. After Elaine's death, Tyree arranged to buy the murder weapon and Aarhus' silence for $5,000, which Tyree was to send by wire to Aarhus' house when Tyree received the knife.

The prosecutor, in his closing argument, suggested that the evidence tended to prove Tyree had planned to have Aarhus murder his wife on Monday night, while Tyree's presence at the movies at Fort Devens supplied the defendant with an alibi. The murder was postponed because Julie Gibson appeared at the Tyrees' apartment at a moment inopportune for the killers. The prosecutor suggested that on Tuesday morning Tyree let Aarhus into the apartment when the defendant ostensibly returned (minutes before delivering his wife) to drop off a baby carrier. The prosecutor emphasized Tyree's initial attempts to create an alibi by calling Captain Klein's attention to his presence on the

---

[7] This explanation was contained in a statement written by Tyree while he was awaiting the results of the search of Aarhus' room. The statement was read to the jury.

base at 12:15 P.M., the approximate time of the murder. Tyree's accounts of his schedule during the morning of the murder, the source of many inconsistencies during various interviews, constituted (according to the prosecutor) attempts to conceal Tyree's meeting with his wife's killer less than an hour before the murder. During his last interview before Aarhus' arrest, Tyree finally realized that his attempts to focus the investigation on Aarhus by indirection were unavailing: Tyree had to risk implicating Aarhus directly in order to avoid his own imminent arrest for his wife's murder.

The defendant's trial lasted fourteen days, and more than thirty-five witnesses testified. Evidence other than that reviewed above will be discussed as it relates to the defendant's claims of error.

1. *Judge's remarks to jury venire.* Before trial, the defendant's trial counsel moved for a continuance on the ground that the publicity accompanying the trial of Erik Aarhus, which then was concluding, adversely affected the defendant's right to a fair trial. The judge denied the motion, stating that he would deal with the problem by excusing, automatically, all potential jurors who had any knowledge of the circumstances surrounding Elaine Tyree's death. He informed counsel that, in the course of his remarks to the venire, he proposed to tell potential jurors, "It is alleged by the Commonwealth that Mr. Tyree employed another individual, a Mr. Aarhus, to murder his wife and that on such and such a day she was murdered. . . . [T]he person who hires or procures a murderer is treated the same as the person who performs the act. Mr. Tyree has denied these charges and plead[ed] not guilty." The judge characterized these remarks as a "standard opening [to inform the jury] that this is what the case involves" intended, among other things, to "[jog] . . . potential jurors' memories as to whether they have heard anything about the case." When trial counsel objected to any mention of Aarhus' name, the judge agreed to omit it. Trial counsel did not make any more specific objection, nor did he ask the judge to omit any reference to the Commonwealth's theory of the case.

During the first day of empanelment, after asking potential jurors to indicate whether they had heard anything about the case, the judge told the venire that the indictment "charges that Mr. Tyree hired an individual to kill his wife" and that, later, she was killed.[8] He read to the venire a list of potential witnesses, and he questioned nineteen members of the venire, most of whom he excused. Only then did trial counsel rise to "record an exception to [the judge's] introductory remarks." Noting that the indictment read only that the defendant "did assault and beat and so forth his wife," counsel stated, "I think what you [are doing] now is help the . . . Commonwealth to establish something that they are incapable [of] proving during a trial."

Later that day, trial counsel moved for a mistrial on this and other grounds. The judge asked whether counsel was attacking the sufficiency of the indictment to support the introduction of evidence that the defendant procured or hired the murderer. Trial counsel replied: "No, I don't say the indictment itself is defective. What I say is . . . that on the facts before you, without . . . the [testimony of the] codefendant,[9] [the prosecution] cannot introduce anything in the trial saying that anyone was hired to kill Elaine Tyree. You have said to the jury, you didn't even allege, you said he hired someone to do it, period. Now, you have got the jury, whether they heard any evidence or not, what difference does it make? *The judge said he hired someone*" (emphasis supplied). The judge denied counsel's oral motion for a mistrial and, when counsel renewed the motion in writing before the next day of jury empanelment, denied the written motion as well. The second day, in his introductory remarks to a second venire, the judge informed the group that "the Commonwealth contends that Mr. Tyree hired

---

[8] The judge's statement was incorrect. The indictment, which was in statutory form, charged that the defendant "did assault and beat one Elaine Tyree with intent to kill and murder her, and by such assault and beating did kill and murder said Elaine Tyree." See G. L. c. 277, § 79.

[9] Defense counsel previously had been granted a severance of the trial of Aarhus from that of the defendant.

someone to murder one Elaine Tyree and she was in fact murdered. As I say, this is not evidence. There is no evidence yet." Trial counsel objected once again, but only after the judge had questioned six potential jurors.

After the jury was empanelled, the judge prefaced his opening statement as follows: "You are the only judges of the facts. That is not my function. You are going to determine the facts in this case based solely on the evidence as you see it and hear it right here in this courtroom and on nothing else." A few minutes later, he told them: "I will have nothing whatsoever to say about the evidence in the case, that is solely for you . . . ." Although trial counsel requested no instructions, the judge instructed the jury at the close of the trial that, in explaining the applicable law to them, he would do his best "not to speak about the evidence, because the evidence, what you believe about the evidence is left entirely for you, that is not my function." He informed the jury that the indictment was not evidence in the case. Finally, he stated that "if during the course of this trial I have done anything that leads you to believe that I have any view whatsoever about these facts, I most earnestly instruct you to disregard it. That is not my function. I will tell you I have no view . . . . I leave to you the determination of these most serious matters." The defendant's trial counsel raised no objection to the judge's instructions.

The defendant's appellate counsel now contends that the judge's remarks to the two venires regarding the theory of the Commonwealth's case constituted material prejudicial error because those remarks "put before the jurors' eyes a prism through which the evidence would be prejudicially refracted, to reach their view in a colored and distorted aspect." This contention is based on counsel's view that the evidence introduced would not support an inference that Tyree "hired" Aarhus to kill his wife.

Although it appears that trial counsel's objections were not timely made, we nonetheless address the issue on its merits. We hold that no legal error occurred. Without question, if a judge, in his remarks to potential jurors, em-

ployed the influence attendant upon his position to enhance the prosecution's case, this would constitute error of the gravest sort. The inaccuracy of the trial judge's remark to the first venire regarding the contents of the indictment, however, could have had no such effect. General Laws c. 274, § 2, as amended, renders any person who "aids in the commission of a felony . . . by counselling, *hiring* or otherwise procuring such felony to be committed" (emphasis supplied) liable to the same extent as the principal felon. The judge's remark accurately described one of the theories of the Commonwealth's case.[10] We do not comprehend how ascribing more specificity to the indictment than it contained could have affected adversely the defendant's rights. See *Commonwealth* v. *Hobbs*, 385 Mass. 863, 870-871 (1982).

The defendant's appellate counsel appears to contend that merely by mentioning one of the theories of the Commonwealth's case, the judge was informing the jury of his belief in the defendant's guilt. That contention is supported neither by the judge's words nor by reasonable inferences to be drawn from those words. Trial counsel did argue that "[t]he judge said [Tyree] hired someone," but that comment is not a fair summary of the judge's remarks, taken in context. In any event, trial counsel's objection apparently was grounded in his belief that, without Aarhus' testimony or his confession, the Commonwealth would not be able to introduce sufficient evidence linking Aarhus and the defendant to allow a jury reasonably to conclude that the defendant was equally guilty of Elaine Tyree's murder. As we

---

[10] In his opening statement, the prosecutor stated: "The Commonwealth will . . . show beyond a reasonable doubt that William Tyree did in fact have his wife killed, murdered. . . . The evidence will show that . . . William Tyree got somebody else, Erik Aarhus, to kill his wife." In closing argument, he informed the jury that "[t]he Commonwealth is contending two things here: Mr. Tyree counseled, procured or hired [Erik] Aarhus to kill Elaine Tyree. The Commonwealth also contends that there was a joint venture, that both these individuals set out and had the intent to kill Elaine Tyree with malice aforethought and deliberate premeditation."

discuss later (in considering the sufficiency of the evidence to sustain the defendant's conviction), trial counsel's belief was unwarranted. To the extent that the defendant's appellate counsel makes different arguments for the first time on appeal with respect to this issue, we have considered them only to prevent a miscarriage of justice. *Commonwealth* v. *Clark*, 378 Mass. 392, 397 (1979). See *Commonwealth* v. *Lewis*, 346 Mass. 373, 383 (1963). There was no error or miscarriage of justice.

2. *Admission of anonymous statement.* While Tyree was incarcerated before trial, he called a correction officer to his cell and showed and read to the officer a typewritten, unsigned, undated three-page statement purporting to be the dying declaration of its anonymous author. The statement, if taken at face value, indicates that Erik Aarhus, Earl Peters,[11] and the declarant (but not the defendant), were involved in the murder of Elaine Tyree. Defendant's trial counsel's only objection to the admission of the document, which is printed in the margin,[12] was on the ground that it

---

[11] The document states that "Mike Peters" was one of the murderers. Earl Michael Peters was the chief prosecution witness. From the contents of the document, it is apparent that its author intended to implicate this witness in the murder.

[12] The document reads as follows: "TO WHOM IT MAY CONCERN, I [space] make this statement as a last and final dying declaration on this day [space], on Jan 30, 1979 at 104 Washington Street, Apartment 1, Ayer, myself, Mike Peters, and Eric Aarhus killed ELAINE TYREE. Sense [sic] I'm going to take my own life I wanted to leave this world with a clear record. We were at the APT. that day looking for Elaine's diary, I was told by Peters that she was keeping a record of our activitys [sic] and had told him that she was going to take them to the police, I can't go on any more, I can still hear her scream, it was UN-GODDLY [sic], we were looking for the diary when she happened, in on us, Peters was looking under the couch, for his shotgun (I think is what it was) and she opened the door and seen him, by that time she was half way out the door, he had AARHUS knife, becuse [sic] the box his gun was in was taped shut, and he just jumped on her, and stabbed her in the arm, the left one I think, and blood spattered all over the door, and on the floor outside the door, she screamed when he stabbed her, every night I hear that scream, then her pleading with him to leave her alone, when he drug [sic] her back in the apartment, AARHUS grabbed her and held her down she begged, but he just kept stabbing her (PETERS) I ran out the door, out towards the back

was received by correction officials on June 26, 1979 (five months after the murder occurred), and contained nothing

of the building, to the door, it led to the basement, I turned ran towards the other door then out to the car, soon the police was there, I thought they were arrested when, peters came out the window, then aarhus, we drove back to ft. devens, we were in my car, I told them no matter what to just keep quite [sic], then Peters came to me and told me he had a idea about setting AARHUS up and letting him take the rap, I told him we were all in it together and if we were arrested to tell the cops, BILL her husband said he would pay us from her military insurence [sic] to kill her (it worked out better than I planned when I heard he had extra polices [sic] on her) they both agreed, but peters without my knowledge, went ahead and set aarhus and BILL went to the police as PETERS said he would, peters planted the knife in aarhus room just a couple of minutes before Tyree got there, and sense [sic] peters told him where he had seen aarhus sharping [sic] the knife earlier, Bill knew just where to tell the cops to go look for it at, and aarhus thinking he was simplely [sic] caught, kept his mouth shut and did what he was told, then when probable cause came around and Tyrees, parents told aarhus, peters set him up, aarhus knew, and said he would change his plea, but aarhus knew then Tyree didn't stunble [sic] on to him he was set up to take the rap, that's why I'm getting out ending it all, becuse [sic] a term in prison would kill me, and peters called me before he left the state a few weeks ago, he said he had film, with some of my affairs (dealing in drugs) on it and they would go to the police, if I didn't keep my mouth shut, god, she screamed and they just kept stabbing her, I have to end it all, I called tyree and I sent him the notes, but it was PETERS that set him up to take the fall for that stuff at ft. devens, it wasn't me, I was buying stolen government property from and his teacher back home was making drugs and I was buying them and re-selling them, but I didn't have anything to do with that at the post you have to belive [sic] me, god, that scream is driving me mad, I hear it every night, and some times in the day, please forgive me. The reason I guess its getting to me is becuse [sic] I knew her, not close but every time I had ever seen her she always seem to well she never did anything to me, and then for peters to do what he did, he was like a mad man and me and aarhus couldn't get him off her, then I ran and I was scared, shocked, it never occured [sic] to me peters was like that, she shouldn't of kept the diary but it wasn't reason to kill her and she was screaming, and the sound of the knife, going in and coming out, like a slurping, sucking sound, and then she started staring right at me, god forgive me, I didn't, I couldn't go to my grave knowing peters was still walking the streets, he threatened me once, god after what I witnessed I think he ment [sic] it, hes a animale [sic] and I'm almost as bad but I had to much to lose, the [word scratched out] and other things please try and understand, but I had to right things before I left, I know you will see that all that is wrong, will be corrected, tell [word scratched out] I'm sorry I wouldn't come forward but I was scared, with the memory of what had happened and it took awhile to

to indicate that it had been written by the defendant. Coun-
sel did not pursue this argument, and the document eventu-
ally was admitted without objection.

The judge, on his own initiative, held a voir dire on the
voluntariness of the statement. The correction officer who
had received the statement from the defendant testified on
behalf of the Commonwealth. Thereafter, the judge en-
couraged the defendant's trial counsel to come forward with
evidence relating to voluntariness. Noting that "to even
raise that issue you have to assume that it [the document] is
[the defendant's] statement," the judge told trial counsel
that, "I am permitting you to raise the issue without aban-
doning your position that it is not Mr. Tyree's statement."
Trial counsel insisted, however, that his sole argument was
that Tyree did not write the letter. At the close of the trial,
the judge instructed the jury that if they did not first con-
clude that the defendant either was the author of the docu-
ment or procured it, they must disregard it entirely. Other-
wise, they could consider the document as evidence of the
defendant's consciousness of his guilt, and of his participa-
tion as a joint venturer in the killing of Elaine Tyree (but
only if they also found evidence outside that document of
the defendant's participation in such a venture).

On appeal, the defendant's appellate counsel claims that
admission of the statement constituted error because (1) the
judge unconstitutionally shifted the burden of proof on the
issue of voluntariness from the prosecution to the defense;[13]
(2) on voir dire, the Commonwealth introduced no evidence
"tending to show that this statement was volitionally made
by Tyree in the sense of putting it forward as his own"; and
(3) the statement "bears on its face the strongest possible

---

sink in that I was in on a murder, and a while longer to figur [*sic*] out
what to do about it I know this is the coward's way out but, what do you
call a grown man that stabbes [*sic*] to death a defenseless woman?"

[13] This claim of error is based on a single statement by the judge prior to
the voir dire: "We will hear from [the officer who received the statement
from the defendant], recognizing that [defense counsel] has the burden of
proof on the voluntariness . . . ."

indicia of having been the product of an irrational intellect," and nothing produced by the Commonwealth on voir dire tended to overcome that inference. The only objection made by defendant's trial counsel, however, seems to have been based on a lack of authentication; once the judge indicated that this lack had been remedied, counsel offered no further objection to the admission of the document.

The judge conducted a voir dire on voluntariness, not at defense counsel's request, but in his own discretion. The judge's remark to counsel about the "burden of proof" borne by defense counsel was intended only to communicate to the defendant's attorney that "[t]he principal burden rests on defense counsel to raise . . . [the] . . . issue [of voluntariness] seasonably." *Commonwealth* v. *Cartagena*, 386 Mass. 285, 287 (1982). Defense counsel's burden (and the "burden of proof" referred to by the judge in the instant case) is simply to produce some evidence, or to argue from evidence already introduced, that the challenged statement was not made voluntarily. If defense counsel fails to do so, voluntariness usually will not be a live issue, and the judge will be under no obligation to deal with that issue.[14] *Id.* *Commonwealth* v. *Tavares*, 385 Mass. 140, 150 (1982), and cases cited.

In this case, defense counsel insisted that he had no evidence to introduce and no argument to make on the issue of voluntariness.[15] The judge rightly concluded that, in the circumstances, the voluntariness of the document was not a live issue in the case.[16] Neither that decision nor the judge's comment to defense counsel was error.

---

[14] Of course, when voluntariness is a live issue, the Commonwealth bears the burden of persuading the trier of fact that the challenged statement was made voluntarily. See *Commonwealth* v. *Meehan*, 377 Mass. 552, 563 (1979).

[15] Defense counsel offered only to bring in one of the defendant's fellow inmates to testify that the letter was the product of a third person and not that of the defendant.

[16] Although the document was brought forth by the defendant while he was incarcerated, nothing in the record suggests that it might be the prod-

We reject the contention of the defendant's appellate counsel that the evidence produced by the Commonwealth on voir dire was insufficient to warrant admission of the document in evidence. If taken at face value, as the defendant obviously intended that it should be when he called a correction officer to his cell and read the document to him, the document exculpates Tyree completely from responsibility for his wife's murder and incriminates both Erik Aarhus and Earl Peters, the chief prosecution witness. From the document itself, the circumstances in which it was received from Tyree, and the evidence involving Tyree's frequent attempts to focus the murder investigation on a suspect other than himself, a trier of fact reasonably could infer that the defendant either drafted that document or had it drafted and turned it over to prison officials in another attempt to mislead investigators. That Tyree may never have intended the document to be construed as having been written by him, or at his instigation, is beside the point.

Similarly, the asserted irrationality of the writer of the document warrants little discussion. If the document was written or procured by Tyree, a trier of fact reasonably could infer that its production (and subsequent transmission to prison authorities) were the acts of a rational, although misguided, individual. In any event, no objection was raised at trial with respect to the alleged irrationality of the writer of the document; the issue is raised for the first time by the defendant's appellate counsel. A defendant "is not permitted to raise an issue before the trial court on a specific ground, and then to present that issue to this court on a different ground." *Commonwealth* v. *Flynn*, 362 Mass. 455, 472 (1972). Accord, *Commonwealth* v. *Clark*, 378 Mass. 392 (1979). Nonetheless, we have reviewed the record in light of the defendant's arguments on this issue, pursuant to G. L. c. 278, § 33E. We find no error of law or substantial

uct of coercion of any kind, or even that government officials were present when it was written. Cf. *Commonwealth* v. *Harris*, 371 Mass. 462, 466-467 (1976) (testimony that police beat defendant until he confessed).

risk of a miscarriage of justice[17] in the admission of the challenged document.

3. *Jury instructions regarding anonymous statement.* The defendant's appellate counsel argues that the judge committed two errors in instructing the jury regarding the anonymous statement received by prison officials from Tyree. Citing *Commonwealth* v. *Vick,* 381 Mass. 43 (1980), he claims that the judge, on his own motion, should have instructed the jury to disregard the statement if they did not find it to be the product of a rational intellect. Appellate counsel also contends that the judge erred in limiting the jury to consideration of the document as evidence inculpating Tyree and thereby precluding them from considering that document at face value, as evidence exculpating him. Since the defendant's trial counsel made no request for instructions and did not object to the instructions given, we consider these arguments only pursuant to our review under G. L. c. 278, § 33E. See *Commonwealth* v. *Cole,* 380 Mass. 30, 38-39 (1980).

The first argument is premised on appellate counsel's belief that the voluntariness of the document continued to be a live issue at trial after its admission. See *id. Commonwealth* v. *Alicea,* 376 Mass. 506, 523 (1978). Although trial counsel failed to raise the issue of voluntariness, appellate counsel insists that the issue "was not capable of being abandoned because the evidence of involuntariness was lodged in the statement itself." We disagree. The judge instructed the jury that, if they did not find Tyree to have been responsible for production of the document, they were to disregard it entirely. Hence, only Tyree's rationality at the time of the production of the document was even arguably relevant. We decline to find proof of irrationality in the production of so self-serving a document. Further, the defendant's trial counsel appears to have made a reasonable tactical decision not to attempt to argue to the jury both that the defendant did not produce the document, and that if the defendant

---

[17] See *Commonwealth* v. *Cole,* 380 Mass. 30, 38-39 (1980).

did produce it, he was irrational at the time. Cf. *Commonwealth* v. *Brady*, 380 Mass. 44, 57 (1980) (Abrams, J., concurring). In any event, we have determined that the voluntariness of the statement was not a live issue at trial; hence, the judge had no duty to instruct the jury with respect to the rationality of its maker.

The second argument advanced by the defendant's appellate counsel is also without merit. Absent evidence from which a trier of fact reasonably could infer that the document was produced, directly or indirectly, by the defendant, that document was not admissible.[18] See McCormick, Evidence §§ 10, 69 (2d ed. 1972). Additionally, defense counsel's only offer of proof that the document was the statement of another person was the testimony of an inmate incarcerated with the defendant at the time the document appeared. The second inmate allegedly would testify that he had seen the document in the cell of a third inmate before Tyree gave it to a correction officer. The third inmate did not testify. The record contains nothing permitting an inference that this third inmate, the alleged author, was in a position to observe the events reported in the document. The judge concluded that the document could not be considered for any purpose if the jury found that Tyree had not written or procured it. In so ruling he did not err, nor did he abuse the broad discretion he possesses with respect to evidentiary matters. See *Commonwealth* v. *Chasson*, 383 Mass. 183, 187 (1981); *Commonwealth* v. *Ferreira*, 381 Mass. 306, 310-311 (1980). Further, we find nothing warranting relief under G. L. c. 278, § 33E.

4. *Admission of noncustodial statements of defendant.* The defendant's appellate counsel argues that the judge erred in failing to apply the Massachusetts "humane practice" to the statements made by the defendant to two of his fellow soldiers while the defendant was being treated in the emergency room of the hospital in Cumberland, Maryland, after Elaine Tyree's funeral. This practice generally re-

---

[18] The document properly could have been excluded as hearsay.

quires that when a defendant's inculpatory statement is to be introduced in evidence, the judge must make an initial finding of its voluntariness; he must also instruct the jury to disregard the statement if they do not find it to have been made voluntarily. See *Commonwealth* v. *Vick, supra* at 45; *Commonwealth* v. *Cole, supra* at 40. Trial counsel did not object to the admission of defendant's statements. We therefore consider this argument pursuant to G. L. c. 278, § 33E. *Id.* at 38-39.

The defendant's statements which form the basis of this claim of error fall into two categories. First, testimony was admitted that the defendant told Sergeant Arena and Specialist Maguire he knew who had killed his wife, but did not intend to reveal the killer's identity to the authorities. We assume, for the purpose of deciding the issue, that admission of these statements was error. If so, the defendant was not prejudiced materially thereby, for he made statements indicating his knowledge of the perpetrator's identity on many occasions. Cf. *Commonwealth* v. *Barrett*, 386 Mass. 649, 653-654 (1982); *Commonwealth* v. *Pickles*, 364 Mass. 395, 400 (1973).

Specialist Maguire testified that the defendant said not only, "I know who killed her," but also that "all I have to do is make one phone call . . . and I'm going to get your wife and [Sergeant] Arena's wife, too." Arena testified, however, that Tyree "screamed, I [Arena] was dead, Specialist Maguire was dead, our wives were dead. Whole funeral detail was dead. Continued screaming. . . . He screamed he had to make a phone call. He had to make a phone call *or* somebody was going to be dead" (emphasis supplied). Assuming again that admission of these statements was error, we conclude that they did not so prejudice the defendant as to require us to exercise our powers under G. L. c. 278, § 33E. The testimony of the two witnesses who testified regarding the defendant's statements appears to conflict: Maguire heard a threat; Arena, only incoherent ramblings. In any event, the record indicates that trial counsel made a tactical decision to allow the testimony

about statements made by the defendant in the emergency room to be introduced without objection in order to increase the likelihood that the hospital records of the defendant's subsequent hospitalization for psychiatric observation would be admitted. These records paint a picture of the defendant as a man driven to despair by his wife's death and his inability to prevent it; they contain numerous statements by the defendant which could be characterized as self-serving.[19] In his closing argument, trial counsel relied on the medical records to counteract the effect of testimony intro-

---

[19] The hospital records from the Walter Reed Medical Center contain the following:

"CHIEF COMPLAINT: 'No sleep, not eating, worrying, wanting my wife back.'

"HISTORY OF PRESENT ILLNESS: The patient lost his wife six days prior to admission. . . . Since that time the patient has not slept at all. His appetite has been very poor and he has lost 10 pounds. He also has feelings of guilt, feeling he should have been the one to have died. On the night prior to admission, following the funeral of the patient's wife, the patient went drinking with his friends and ingested 8-9 alcoholic beverages at least. . . . He recalls being very belligerent and combative when attempts were made to sedate him after he was taken to the [Cumberland hospital] emergency room . . . where he was admitted with the diagnosis of 'acute psychosis.'

". . . .

"MENTAL STATUS EXAMINATION: . . . Thought content revealed no hallucinations, delusions, suicidal or homicidal ideation. The patient admitted anger that although he had asked for police and FBI protection after he had received threatening phone calls of several months duration the United States Government was unable to prevent the death of his wife.

". . . .

"HOSPITAL COURSE: . . . He was cooperative during all ward processes, although he became angry at the thought of detention in a hospital following a phone call from his parents that his sister had been threatened on a train that she might be harmed if 'she didn't keep her mouth shut.' On the day of admission the patient showed profuse tears with feelings of loss and guilt that he should have been with his wife when she was injured to have protected her or should have been the one to have taken the blow. . . .

"PRESENT CONDITION: . . . He states that he does not fear for his own life and he plans to return to Fort Devens, Massachusetts to clean his apartment and apply for a 30-day leave to be with his parents. He does not give evidence of auditory or visual hallucinations, nor suicidal or homicidal ideations. . . ."

duced by the prosecution about Tyree's behavior at the time of the funeral. We cannot say that trial counsel's decision was unreasonable; certainly, it is not a basis for granting the defendant either a new trial or a reduction in the degree of his guilt.

5. *Denial of motion for required finding of not guilty.* At the close of the Commonwealth's case, trial counsel made a motion for a required finding of not guilty. The motion was denied. On appeal, the defendant claims that the denial of this motion was error, arguing that the evidence introduced by the Commonwealth was insufficient to sustain his conviction. We have reviewed the evidence in the light most favorable to the Commonwealth. *Commonwealth* v. *Campbell*, 378 Mass. 680, 686 (1979). We find the evidence amply sufficient to sustain the conviction. The evidence was such that a rational trier of fact reasonably could have found the defendant guilty of Elaine Tyree's murder, either as an accessory before the fact or as a joint venturer. The evidence tended strongly to show that the defendant did not have a good relationship with his wife and wished to be rid of her, arranged to profit from her death through the proceeds of insurance on her life (the bulk of which he acquired only weeks before her murder), negotiated with Erik Aarhus to murder her, and, after the murder, lied to investigating officers in an attempt to conceal his own involvement. Appellate counsel asserts that Tyree's attempts indirectly to implicate Aarhus in the murder "are totally incompatible in logic with the existence of" a joint venture between Aarhus and Tyree to commit the murder. On the contrary, the evidence clearly permits the inference that Tyree planned from early in the investigation to sacrifice Aarhus, intending to do so in a fashion that would not result in Aarhus' learning of Tyree's intentions and thereafter revealing to the authorities Tyree's part in the murder. There was no error.

6. *Review pursuant to G. L. c. 278, § 33E.* In the course of this opinion, we have discussed the defendant's specific allegations of error in the context of our § 33E review. We

have also reviewed the entire record. We find no result "more consonant with justice" (*Commonwealth* v. *Baker*, 346 Mass. 107, 109 [1963]) in this case than that reached by the jury.

*Judgment affirmed.*